72 Cal.App.3d 143 (1977)
140 Cal. Rptr. 49
THE PEOPLE, Plaintiff and Respondent,
v.
WALTER BOWIE, Defendant and Appellant.
Docket No. 29480.
Court of Appeals of California, Second District, Division Five.
July 28, 1977.
*146 COUNSEL
Paul Halvonik, State Public Defender, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, Kent Richland and J. Courtney Shevelson, Deputy State Public Defenders, for Defendant and Appellant.
Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and William V. Ballough, Deputy Attorneys General, for Plaintiff and Respondent.
OPINION
ASHBY, J.
In a jury trial appellant was convicted on 11 counts of possession of blank checks with intent to defraud in violation of Penal Code section 475. Appellant was sentenced to state prison.
The 11 counts involved 11 checks of a defunct corporation known as Eve Le Coq which were imprinted with a check protector, each in the amount of $198.45. On April 23, 1976, appellant sold these checks to Billie James Reaves with intent to have Reaves fill them in and pass them, in order to defraud other persons. Reaves was acting as an undercover agent for the police.
Reaves testified that earlier in April appellant had supplied Reaves with another check, also drawn on a defunct corporation, Eddie Nober, Inc.,[1] signed by Jack Slade, and they agreed that Reaves would attempt to pass it and would split the proceeds with appellant. However, Reaves was arrested in possession of this check and was questioned about it. Reaves agreed to cooperate with the police to see if appellant would sell him any more checks, which led to the instant transaction. In return for his cooperation, Reaves was allowed to plead guilty to misdemeanor forgery, was given one year summary probation with no jail time, and his parole was not revoked.
In a series of tape-recorded telephone calls from the police station and conversations at appellant's apartment, Reaves negotiated the purchase of the checks and possible purchase of a fake driver's license from *147 appellant. On April 23, Reaves went to appellant's apartment and purchased the 11 checks for $100 in marked bills. Four of the marked $20 bills were found in appellant's apartment later that day in a search pursuant to a warrant. On arrest, appellant also had in his wallet a check stub which appeared to correspond to the Eddie Nober, Inc., check which Reaves had possessed.
The various tape recordings were admitted into evidence. Appellant presented no defense.

CONTENTIONS
(1a) Appellant contends (1) that the court erred in refusing to instruct on entrapment; (2) that the court erred in admitting the tape recordings into evidence without requiring the court reporter to transcribe them; (3) that the 11 counts should have been consolidated into 1 count; and (4) that the judgment requires modification as to prior convictions.

INSTRUCTION ON ENTRAPMENT
Appellant requested that the jury be instructed on entrapment. The trial court refused, saying: "... I have come to the conclusion that it would be improper to give the instruction regarding entrapment because in this case it would take speculation in order to determine that there was entrapment here. The only thing Mr. Reaves did was ask Mr. Bowie to get some checks. Mr. Bowie did not have any checks at that time, but he had no problem getting them. He did not argue against getting them. True, he had trouble getting them and communicated that to Mr. Reaves, and that is in the evidence, but from this you would have to really speculate to say that this delay was because Mr. Bowie really did not want to do this and was doing it only on the inducement of Mr. Reaves. But the fact is that Mr. Reaves did nothing to really induce him. He just asked him to do it, provided the opportunity, which I think the law is quite clear is not a matter of entrapment."
The trial court correctly determined this issue. (2) A requested instruction must be given if there is any evidence deserving of any consideration whatever which would support the instruction. (People v. Carmen, 36 Cal.2d 768, 773 [228 P.2d 281]; People v. Alamillo, 113 Cal. App.2d 617, 620 [248 P.2d 421].) But if there is no evidence to support such instruction, it need not be given. (People v. Sedeno, 10 Cal.3d 703, 718 [112 Cal. Rptr. 1, 518 P.2d 913].)
*148 (1b) Here appellant sold the blank checks to Reaves with intent for Reaves to pass them in order to defraud other persons. (3) The transaction is analogous to the legion of cases involving sales of contraband in which the rule is established that the ordinary persuasion incident to a sale between a ready buyer and a willing seller raises no inference of entrapment. (1 Witkin, Cal. Crimes, § 181, p. 173; Note (1968) 19 Hastings L.J. 825, 842-843.) Where the evidence discloses only the persuasion ordinarily incident to such a sale, no instruction on entrapment need be given. (People v. Gossett, 20 Cal. App.3d 230, 233 [97 Cal. Rptr. 528]; People v. Cain, 15 Cal. App.3d 687, 696-697 [93 Cal. Rptr. 388]; People v. Cruz, 6 Cal. App.3d 384, 393 [85 Cal. Rptr. 918]; People v. Bourland, 247 Cal. App.2d 76, 91-94 [55 Cal. Rptr. 357]; People v. Price, 172 Cal. App.2d 776, 778-779 [342 P.2d 437]; People v. Richardson, 152 Cal. App.2d 310, 318 [313 P.2d 651]; People v. Alamillo, supra, 113 Cal. App.2d 617, 620-621.) These cases are consistent with the general rule that where there is no evidence of entrapment, an instruction thereon need not be given. (See People v. Perez, 62 Cal.2d 769, 775 [44 Cal. Rptr. 326, 401 P.2d 934]; People v. Malotte, 46 Cal.2d 59, 65-66 [292 P.2d 517]; People v. Baker, 39 Cal. App.3d 550, 557 [113 Cal. Rptr. 248]; People v. Lewis, 214 Cal. App.2d 799, 801-802 [29 Cal. Rptr. 825].) Each case, of course, must be decided on its own facts. (People v. Goree, 240 Cal. App.2d 304, 310 [49 Cal. Rptr. 392]; People v. Bourland, supra, 247 Cal. App.2d 76, 93.)
(1c) Appellant contends that the record contains evidence from which it could reasonably be inferred that appellant refused Reaves' initial requests, kept putting Reaves off, or otherwise showed reluctance or hesitancy to supply the checks. This contention is without merit. Appellant relies upon an unofficial transcription of the tape of the recorded telephone conversations, which appellant attaches as an appendix to his opening brief. The People argue that the unofficial transcript is not properly a part of the record, but even assuming that it accurately sets forth the conversation, it provides no evidence upon which an entrapment instruction could be based. We agree.
Appellant argues that his first reaction to Reaves' statement, "... I just wonderin' if I can pick up some paper," was, "No man I ain't doin' nothin'." However, the context of the next few statements shows that when appellant said this he did not understand what Reaves was asking for. When Reaves made clear his request, appellant said, "Oh man, let me see." This was not a refusal. Appellant immediately stated, "Okay. Well I'll try. When you want it for the weekend?"; said he would "get in touch with the dude this evening" and instructed Reaves to call him back *149 in the morning. Appellant next argues that when Reaves asked whether appellant could "do anything on the ID," appellant refused, saying, "No, I, cause I ain't got no bread...." However, the context of the next several statements shows that appellant merely meant that Reaves would have to pay "out front" for a fake ID. When Reaves indicated he would try to come up with the "front" money, appellant said, "Okay. Well, let me know that tomorrow, ..." None of these statements indicates any reluctance on appellant's part.
When Reaves called the following day, appellant indicated, "[T]hat dude, I couldn't reach him last night.... [¶] ... Well, if I could catch up with what's his name like I thought. I missed him you know, yesterday. I thought he got off work at 4:30 and he got off work at 3:30. He go to work at 7 and get off at 3:30." However, after asking a few questions about Reaves' plan, appellant said, "Yeah well, I'll see when he.... [¶] Well, I'll try to catch him. I, I know he get off at 3:30 there so I'll be there at 3:30 you know.... [¶] ... Call me back at 4 o'clock. Cause if I catch him at 3:30, I be back at 4." Appellant then made arrangements for Reaves to bring him the front money the next day. Appellant's argument that this conversation could possibly be construed as "stalling" is based on pure speculation, as stated by the trial court. The delay was nothing more than that ordinarily entailed when dealing with a middleman. (See People v. Bernal, 174 Cal. App.2d 777, 779 [345 P.2d 140]; People v. Bourland, supra, 247 Cal. App.2d 76, 92-93; see also People v. Alamillo, supra, 113 Cal. App.2d 617, 619; People v. Malotte, supra, 46 Cal.2d 59, 62.) Appellant's alleged "delay" bears no resemblance to the repeated refusals which required entrapment instructions in such cases as People v. Marsden, 234 Cal. App.2d 796, 798-799 [44 Cal. Rptr. 728], cited by appellant, and People v. West, 139 Cal. App.2d Supp. 923, 925-926 [293 P.2d 166].
Appellant's familiarity with the pattern and jargon of the check-passing scheme, and his access to a source of supply tend to show that he was not an innocent citizen unlawfully persuaded by law enforcement authorities to commit a crime. (See People v. Lara, 253 Cal. App.2d 600, 606 [61 Cal. Rptr. 303].) Appellant's reliance on People v. Monteverde, 236 Cal. App.2d 630, 642 [46 Cal. Rptr. 206], where a citizen with no known history of any wrongdoing obtained contraband through a local peddler, is misplaced. Here there was other evidence showing that appellant was regularly engaged in such activity, namely, the prior transaction involving the check from Eddie Nober, Inc., through which appellant and Reaves were to split the proceeds if Reaves successfully *150 passed it. Appellant's argument that the jury might have disbelieved this portion of Reaves' testimony is beside the point, since even if they had, there is still no positive substantial evidence of entrapment.
Appellant contends that Reaves offered appellant a large financial inducement. He relies upon Reaves' statement, "I'll pay whatever you want me to pay you understand." This statement is wholly unlike the evidence in People v. Monteverde, supra, relied upon by appellant, where the undercover agents flashed several thousand dollars' worth of bills at the defendant.
Appellant argues that Reaves offered him a special inducement, when Reaves indicated that he wanted to try something on the weekend going north to San Francisco and he hoped that appellant could get the checks that night. This may have explained Reaves' ostensible reason for wanting the checks, but it was not like the special appeal to friendship made in People v. Marsden, supra, 234 Cal. App.2d 796, 798-799, relied upon by appellant. Even the statement that a drug addict is "sick," without more, has been held insufficient to raise an inference of special inducement so as to require an entrapment instruction. (People v. Griffin, 209 Cal. App.2d 557, 563 [26 Cal. Rptr. 311]; People v. Finn, 136 Cal. App.2d 152, 155-156 [288 P.2d 281]; cf. People v. Ortiz, 200 Cal. App.2d 250, 258 [19 Cal. Rptr. 211]; People v. Valdez, 132 Cal. App.2d 783, 786 [283 P.2d 36]. See also People v. Taylor, 154 Cal. App.2d 368, 369-371 [316 P.2d 425] (request, "Oh, please, would you?" held insufficient to justify entrapment instruction).)
Appellant contends that the fact it was strongly in Reaves' self-interest to cooperate with the police would justify an inference he used undue persuasion on appellant. This contention is without merit. Reaves' motive to use undue persuasion is irrelevant if there is no evidence he actually did use undue persuasion.[2]
There is no evidence deserving of any consideration which would have supported an instruction on entrapment. Appellant's contention that the court's refusal to instruct on this issue deprived him of effective *151 assistance of counsel in jury argument[3] adds nothing to the strength of his argument. If there is no evidence to support an instruction, a trial court is not required to give it even if requested by defense counsel. (People v. Sedeno, supra, 10 Cal.3d 703, 718.) The trial court properly refused to instruct on entrapment.

TRANSCRIPTION OF TAPE RECORDINGS
(4) When the prosecutor began to question Reaves about the tape recordings of his conversations with appellant, the prosecutor stated:
"Q. BY MR. LUKUS; Mr. Reaves, I'm going to play a tape recording that purports to be one of the telephone conversations that you had with the [appellant]. I will start off with the first one, and I'm going to ask you to identify the voices on it. [¶] As I start to play them, would you just listen to this recording and I will stop it at the opportune time. [¶] Your Honor, may the court reporter not attempt to transcribe the contents of the tape recording since we are going to put this in evidence, since there is no transcription?
"THE COURT; Yes. Mr. Weber, no need to report this."
Appellant made no objection to this procedure at that time. Appellant now contends, however, that the trial court erred in failing to require the court reporter to transcribe the tapes as they were played to the jury. This contention is without merit.
In the first place, this contention must be deemed waived by appellant's failure to object in the trial court when it was proposed that the reporter not transcribe the tape. (See People v. Spencer, 60 Cal.2d 64, 80 & fn. 9 [31 Cal. Rptr. 782, 383 P.2d 134].) Even on the merits, however, appellant's argument is unpersuasive.
In People v. Mulvey, 196 Cal. App.2d 714, 719 [16 Cal. Rptr. 821], and People v. Harris, 199 Cal. App.2d 474, 475-476 [18 Cal. Rptr. 708], the court stated its disapproval of the practice of playing a tape recording to the jury without having a transcription of the recording made. While having a transcript serves the convenience of the jury, counsel, and the trial and appellate courts, it does not follow that the absence of a transcript creates error or that the procedure now suggested by appellant *152 is the best one. Where the tape recording is admitted into evidence, the record of the trial is not incomplete. At considerable inconvenience, the appellate court could, if necessary, listen to the tape. (People v. Spencer, supra, at p. 79. See also People v. Moran, 39 Cal. App.3d 398, 405 & fn. 4 [114 Cal. Rptr. 413]; People v. Hill, 233 Cal. App.2d 611, 612, 615 [43 Cal. Rptr. 840]; cf. People v. Bowman, 240 Cal. App.2d 358, 376-377 [49 Cal. Rptr. 772] (tape excluded).) In fact, sometimes the appellate court considers the tape recording to be a better record of what occurred at trial than the reporter's transcript of the tape as played to the jury. In Spencer, supra, the reporter attempted to transcribe the tape as it was played to the jury. The reporter's transcript indicated that 162 portions of the tape were unintelligible. However, the Supreme Court listened to the tape and found that it was clear in virtually every place the reporter had found it unintelligible. (See also People v. Moran, supra (videotape).) As Spencer demonstrates, having the reporter attempt to transcribe the tape as it is played to the jury is very awkward and may lead either to inordinate delays in presentation of such evidence or to errors in transcription. If a transcription is going to be used, it would be preferable to have it prepared prior to trial or outside the presence of the jury so that the tape could be stopped and portions replayed to facilitate accurate transcription. (See People v. Spencer, supra; People v. Ketchel, 59 Cal.2d 503, 517-519 [30 Cal. Rptr. 538, 381 P.2d 394]; People v. Albert, 182 Cal. App.2d 729, 741-742 [6 Cal. Rptr. 473]; People v. Fujita, 43 Cal. App.3d 454, 472-473 [117 Cal. Rptr. 757].) Determination of the appropriate procedure in any particular case must be vested in the discretion of the trial court.
Finally, appellant acknowledges that, even assuming there was error, he must show he suffered prejudice. (People v. Mulvey, supra, 196 Cal. App.2d at pp. 720-721; People v. Harris, supra, 199 Cal. App.2d at p. 476.) The only prejudice he claims with regard to the playing of the tapes is that the prosecutor improperly questioned Reaves by interrupting the playing of the tapes. The prosecutor's method of examination was to play a portion of the tape, stop the recording, and then question Reaves about who had said what during that portion of the recording. To illustrate how this was done, we quote a portion of the transcript which contains examples of the prosecutor's questions, the nature of appellant's objections thereto, and the trial court's ruling on those objections:
[The following material is copied from the reporter's transcript.]
(Playing of tape recording resumed.)
*153 Q. BY MR. LUKUS: All right. In that tape someone says "How much do you want for them?" Can you tell me who asked that question between you and Mr. Bowie?
A. I asked.
Q. What were you asking about on the tape when you asked "How much do you want for them?"
A. I was talking about the purchase of the checks.
Q. Do you remember that voice who responded to your question "How much do you want for them?" Was that the defendant or Mr. Bowie?
A. Yes.
(Playing of tape recording resumed.)
Q. BY MR. LUKUS: All right. On the tape there was a discussion of a signature. Who was talking about a signature?
MR. PECK: Your Honor, I think the tape speaks for itself. The jurors can listen to it and conclude who is speaking.
THE COURT: Objection overruled.
Q. BY MR. LUKUS: Who was talking about a signature on the tape, the portion of the tape I just played?
A. That was Walter Bowie.
Q. What was the discussion about the signature?
A. I asked him who was going to sign it.
Q. Was that discussed about who was going to sign some checks that he was going to provide for you?
A. Right.
(Playing of tape recording resumed.)
*154 Q. BY MR. LUKUS: All right. There was a voice on the tape that said "These can go in town or out of town because they have a bank here and a bank in New York." Who said that?
A. Walter Bowie.
Q. What was he talking about when he said "There's a bank here and there is a bank out of town?" Was he talking about the bank that the checks were drawn on?
MR. PECK: Counsel is asking a leading question.
THE COURT: Sustained.
Q. BY MR. LUKUS: What checks was he talking about?
A. The checks that you have in the evidence.
Q. And these are the checks that are drawn on the Manufacturers Hanover Trust, New York City, People's I for identification?
A. Right.
(Playing of tape recording resumed.)
Q. BY MR. LUKUS: All right. On the tape there is a voice that says, in response to a question about a driver's license, that he will get the driver's license at some later time. Whose voice was that talking about getting a driver's license at a later time?
A. Walter Bowie.
MR. LUKUS: I'll continue to play the tape.
(Playing of tape recording resumed.)
Q. BY MR. LUKUS: On the tape there is a voice 
MR. PECK: Your Honor, may we approach the bench?
THE COURT: Yes.
(The following proceedings were had at the bench:)
*155 MR. PECK: Your Honor, I think I would object to this whole procedure of stopping the tape and asking about specific passages to highlight them for the jury. They can hear the tape. They should hear it in context. They should hear the whole tape. The voices have been identified. We are only dealing with two voices. They can conclude who is saying what without counsel, in effect, editorializing and pointing out certain passages he wants the jury to hear.
It seems to me it consumes a great deal of time unnecessarily. It is going to be putting me in a position of going through the tape and picking and choosing bits and pieces, too. It seems unnecessary, and I think it is improper. They should hear the tape and play it back for themselves later in their deliberations, if they think it appropriate.
It is not as though we were dealing with a multiplicity of voices.
THE COURT: I think, Mr. Lukus, probably a better way to do it would be somewhat the same way you are doing it now, except to avoid repeating what you have concluded that the tape states. I think it would be quite proper for you, however, to stop the tape at an appropriate time and ask the witness to state what was said.
[This concludes the quoted material from the reporter's transcript.]
Appellant now argues that what the prosecutor was doing constituted improper "highlighting and editorializing." He next argues that the failure of the reporter to transcribe the tape as played, makes it impossible to show at what points the prosecutor stopped the tape, and that this in turn makes it impossible for appellant to demonstrate prejudice resulting from the prosecutor's questioning. This contention is without merit. First, we do not agree that it would be impossible, if necessary, to determine the points at which the tape was stopped, by listening to the tape and comparing the context to the transcript of the prosecutor's questions. Second, it is appellant's burden to make a trial record which will show that prejudicial error occurred. As noted, he did not object to the reporter's failure to report the tape recording.[4] Third, the claimed prejudice lies not in the failure to transcribe the tapes but in the nature of the prosecutor's questions. We do not even have to listen to *156 the tapes to see that these questions properly clarified for the jury what was said on the tapes and who said it. While this may have been time consuming, it was not prejudicial. No prejudicial error has been shown.

CONSOLIDATION OF COUNTS
(5) Appellant was charged and convicted on 11 counts of violation of Penal Code section 475, which provides in pertinent part: "Every person who ... has or keeps in his possession ... any blank or unfinished check, ... with intention to fill up and complete such blank and unfinished ... check, ... or procure the same to be filled up and completed in order to utter or pass the same, or to permit, or cause, or procure the same to be uttered or passed, to defraud any person, is punishable by imprisonment in the state prison ... or by imprisonment in the county jail for not more than one year."
On the first day of trial, appellant moved to consolidate the 11 counts into one count, on the ground that his possession of the 11 identical blank checks was a single act which constituted but one violation of the statute. The trial court erred in denying this motion. Our research has led us to People v. Puppilo, 100 Cal. App. 559 [280 P. 545], which we find to be determinative. There the defendant was charged on two counts with violation of the statute which prohibited an unnaturalized, foreign born person to possess "`any pistol, revolver or other firearm capable of being concealed upon the person....'" (Id., at p. 560.) The two counts were based upon the finding of two pistols in the defendant's home on a certain date. The court held that under such circumstances there could be only one crime, not two. "... The act denounced by the statute is the possession of a firearm, as therein described. While it is true that the singular number is used, it is almost axiomatic, and is in fact so provided by our statutes, that the singular number includes the plural." (Id., at p. 563. See Pen. Code, § 7.)
Similarly in this case appellant possessed all 11 checks at the same time and was guilty of only 1 violation of Penal Code section 475. Although the statute refers to "any check," the singular includes the plural.
The People cite no case supporting multiple counts in these circumstances. People v. Neder, 16 Cal. App.3d 846, 852-853 [94 Cal. Rptr. 364], is distinguishable because it was a prosecution for forgery under Penal Code section 470 in which it was held that three separate forgeries on *157 three separate sales slips charged on another person's credit card constituted separate offenses. Here the prosecution was based on possession, not forgery. Respondent's argument that there were 11 "potential victims" is not controlling in these circumstances. (See People v. Lyons, 50 Cal.2d 245, 275-276 [324 P.2d 556] (single act of receiving property which had been stolen from separate victims constituted only one crime of receiving stolen property); cf. People v. Roberts, 182 Cal. App.2d 431, 436-437 [6 Cal. Rptr. 161] (receipt at separate times of property stolen from separate victims constituted separate offenses).)
An appropriate course in these circumstances is to affirm the judgment as to one count and reverse as to the other counts. (People v. Lyons, supra.)

PRIOR CONVICTIONS
(6) The prosecutor filed an amendment to the information alleging that appellant had seven prior convictions. Appellant admitted two of these prior convictions, but denied the others, asserting that he had been acquitted of those charges or they had been dismissed. Respondent concedes that no evidence was introduced to prove the priors which were not admitted.
Yet the judgment recites that all the priors were found true. At the time of oral pronouncement of judgment, the trial court stated: "I'm going to sentence Mr. Bowie to the state penitentiary. I'm not going to sentence him on the priors, however.... [¶] I find the priors to be true. However, I am not sentencing as to those priors." The court's statements at the time of oral pronouncement of judgment are controlling. (People v. Mesa, 14 Cal.3d 466, 471-472 [121 Cal. Rptr. 473, 535 P.2d 337]; People v. Hartsell, 34 Cal. App.3d 8, 13-15 [109 Cal. Rptr. 627].) The court's comments show clearly that it did not intend to sentence appellant as a prior offender, and respondent so concedes. (People v. Mesa, supra; In re Van Heflin, 58 Cal. App.3d 131, 136 [128 Cal. Rptr. 257]; see also In re Candelario, 3 Cal.3d 702, 706 [91 Cal. Rptr. 497, 477 P.2d 729]; People v. Watts, 59 Cal. App.3d 80, 88 [130 Cal. Rptr. 601]; People v. Chapman, 47 Cal. App.3d 597, 612 [121 Cal. Rptr. 315]; People v. Mason, 34 Cal. App.3d 281, 289-293 [109 Cal. Rptr. 867]; cf. People v. Meals, 48 Cal. App.3d 215, 225-227 [121 Cal. Rptr. 742].) Therefore the reference to prior convictions in the judgment should be stricken.
*158 The judgment is reversed as to counts 2 through 11. The judgment is modified by striking therefrom the reference to prior convictions. As modified, the judgment as to count one is affirmed.
Kaus, P.J., and Hastings, J., concurred.
Appellant's petition for a hearing by the Supreme Court was denied September 28, 1977.
NOTES
[1] Eddie Nober also founded Eve Le Coq.
[2] On cross-examination Reaves testified:

"Q. Even if he was reluctant, you were supposed to talk him into it? That was the deal; right?
"A. No, I wouldn't go that far.
"Q. Well, you were supposed to persuade him to do it; right?
"A. I was supposed to ask him to see if he could do it."
[3] Appellant's trial counsel told the court that if no instruction on entrapment were given he would not argue to the jury.
[4] Appellant's reliance on People v. Gloria, 47 Cal. App.3d 1, 7 [120 Cal. Rptr. 534], is misplaced. There the written instruction to the jury as contained in the clerk's transcript was not supported by the evidence and was prejudicial to the defendant. The effect of the reporter's failure to transcribe the instruction as given orally was to prevent the People from showing that the instruction as actually given was correct.