184 Cal.App.4th 422 (2010)
THE PEOPLE, Plaintiff and Respondent,
v.
MICHAEL AYIKU OTUBUAH, Defendant and Appellant.
No. E047271.
Court of Appeals of California, Fourth District, Division Two.
April 7, 2010.
As modified May 6 & 12, 2010.
*425 Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Pamela Ratner Sobeck and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
RAMIREZ, P. J.
A jury convicted defendant and appellant Michael Ayiku Otubuah of 19 counts (1, 2, 5, 7, 9, 14, 16, 18, 24-34) of unlawful use of personal identifying information (Pen. Code, § 530.5, subd. (a)),[1] nine counts (3, 4, 6, 8, 11, 12, 15, 17, 19) of burglary from a store (§ 459), one count (10) of grand theft (§ 487), one count (13) of attempted grand theft (§§ 664, 487), one count (20) of receiving stolen property (§ 496, subd. (a)), one count (21) of possessing a firearm as a felon (§ 12021, subd. (a)), one count (22) of possessing a counterfeit driver's license with the intent of using it to commit any forgery (§ 470b), and 27 counts (counts 35-61) of forgery for possessing completed checks with the intent to defraud (§ 475, subd. (c)). Defendant contends that only one conviction lies for all of the 27 forgery counts because all 27 checks were possessed on a single occasion. We reverse 24 of the 27 forgery convictions, leaving one conviction per victim, and modify to impose omitted court security fees.

I. BACKGROUND
Defendant was involved in an identity theft ring. The parties stipulated that, on or about May 20, 2008, one of the other participants in the identity *426 theft ring was found with 27 counterfeit checks. According to the stipulation, two checks issued by 3P Delivery, Inc., seven checks issued by Escrows Unlimited, Inc., and 18 checks issued by Capital One, were found in the other participant's car. Found in the same participant's bedroom were one check issued by Capitol One, and one check issued by Escrows Unlimited, Inc. The checks were also admitted into evidence. All of the checks had signatures on them and were made out to several different payees, including two of the participants in the identity theft ring.
One of the participants in the theft ring testified that the first time defendant gave her a counterfeit check she deposited it into her bank account; the bank then closed her account because the check was counterfeit. Subsequently, she would just take the checks into a bank for cashing. She cashed eight or nine checks that defendant gave her "from a woman that he identified as Anne." All of the checks from Anne went through. She attempted to cash "a lot" more checks provided by defendant than just the eight or nine checks from Anne. Most of the time, the checks that were not from Anne did not go through.
At sentencing, count 1 was set as the principal count. Defendant was sentenced to consecutive terms of one-third the midterm, eight months, on three counts, one pertaining to each of the three different issuers (counts 35, 37 & 44). The trial court imposed and stayed the upper term of three years on each of the 24 remaining section 475, subdivision (c), counts. Including the sentences for the convictions not challenged in this appeal, defendant was sentenced to a total prison term of 20 years four months.
Only one $20 court security fee was imposed.

II. POSSESSION OF MULTIPLE CHECKS AS MULTIPLE FORGERIES
Defendant contends he should have only received one consecutive sentence rather than three because all the checks were possessed on a single occasion. The People contend that the three consecutive sentences were proper because there were three victims, but that the 24 stayed counts should be reversed. Defendant agrees with the People's contention that the stayed counts should be reversed, and further argues that only one sentence was proper and thus 26 of the 27 counts should be reversed. We agree with the People. First we determine that three convictions lie, then we discuss the case law relied upon by defendant and in particular an opinion, with which we disagree, from one of our sister districts.

*427 A. Number of Convictions

Section 475, subdivision (c), states: "Every person who possesses any completed check, money order, traveler's check, warrant or county order, whether real or fictitious, with the intent to utter or pass or facilitate the utterance or passage of the same, in order to defraud any person, is guilty of forgery."
(1) Defendant contends section 475 specifies a mere possessory offense. The People contend that section 475 is a forgery offense that occurs once for each victim, because each victim has had his or her autonomy violated. We agree that section 475 states one of many ways of committing forgery, and hold that, forgery by possession of checks occurs once per victim.
(2) The single crime of forgery may be committed in many ways. (See §§ 470-476.) "The real essence of the crime of forgery ... is not concerned with the end ... it has to do with the means, i.e., the act of signing the name of another with intent to defraud and without authority, or of falsely making a document, or of uttering the document with intent to defraud." (People v. Neder (1971) 16 Cal.App.3d 846, 852-853 [94 Cal.Rptr. 364].) Because forgery has to do with the means of attempting fraud, forgery offenses target invasions of financial autonomy. In the context of possession of checks, each real person, or entity, whose checks are possessed by a forger, has had their autonomy over their financial accounts violated.
(3) Defendant was convicted of 27 counts of forgery for possessing completed checks with intent to defraud. The checks were from three issuers. Defendant thus violated the financial autonomy of three victims, and committed forgery once for each victim. Accordingly, one conviction for each victim is appropriate, and the remaining 24 counts must be reversed.

B. Applying Section 654

Having concluded that three convictions lie, we evaluate whether the sentence for any of the three convictions should be stayed pursuant to section 654.
(4) "Section 654 precludes multiple punishment for a single act or omission, or an indivisible course of conduct. [Citations.] If, for example, a defendant suffers two convictions, punishment for one of which is precluded by section 654, that section requires the sentence for one conviction to be imposed, and the other imposed and then stayed. [Citation.] Section 654 does not allow any multiple punishment, including either concurrent or consecutive sentences. [Citation.]" (People v. Deloza (1998) 18 Cal.4th 585, 591-592 [76 Cal.Rptr.2d 255, 957 P.2d 945].)
*428 When a court sentences a defendant to separate terms, it makes an implicit determination that the defendant held more than one criminal objective. (People v. Osband (1996) 13 Cal.4th 622, 730-731 [55 Cal.Rptr.2d 26, 919 P.2d 640].) "A trial court's implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if it is supported by substantial evidence." (People v. Blake (1998) 68 Cal.App.4th 509, 512 [80 Cal.Rptr.2d 308].)
The trial court imposed three separate terms, one for each of the three issuers, and applied a section 654 stay to the remaining 24 section 475, subdivision (c) counts. Checks possessed with the intent to defraud could be intended to defraud issuers, drawees, payees, and third parties. The completed checks contained the account information of three issuers. Because the ring had previously cashed checks, it may be inferred that the intent was to defraud the issuers by cashing their checks. Accordingly, there was substantial evidence supporting the trial court's implied finding that defendant's identity theft ring harbored a separate intent to defraud at least each of the three issuers, and thus section 654 does not mandate staying any of the three convictions.

C. Prior Interpretation of Possession of Checks with Intent to Defraud

Prior to a 1998 recodification, possession of any blank or completed checks, with the intent to defraud any person, amounted to only one offense. (See, e.g., People v. Carter (1977) 75 Cal.App.3d 865, 870-872 [142 Cal.Rptr. 517] (Carter) [completed checks under former § 475a]; People v. Bowie (1977) 72 Cal.App.3d 143, 156-157 [140 Cal.Rptr. 49] (Bowie) [blank checks under prior version of § 475].) Former sections 475 and 475a were repealed in 1998 and recodified as current section 475, subdivisions (b) and (c). (Stats. 1998, ch. 468, §§ 3-5, p. 3257.)
In People v. Morelos (2008) 168 Cal.App.4th 758, 763-765 [85 Cal.Rptr.3d 741] (Morelos), the Fifth Appellate District, in the context of blank checks under subdivision (b) of section 475, reviewed a postrecodification case. Because we disagree with Morelos, we review the basis for its contrary holding and also review the two prerecodification cases that Morelos was, in effect, applying to the postrecodification section 475.
Among convictions for numerous other counts, the defendant in Morelos was convicted of 15 counts of forgery for possession of blank checks. One of the other convictions was used as the principal term; and among many other consecutive one-third midterms, the trial court imposed four consecutive one-third midterms and imposed concurrent terms for the remaining blank *429 check possession counts. (Morelos, supra, 168 Cal.App.4th at p. 761.) The checks were issued by six different victims. The Attorney General conceded reversal of all but six counts, but urged a "`multiple victims exception for forgery victims' [to] save the remaining six counts." (Id. at p. 764.)
The Fifth District rejected this argument and relied on Bowie and Carter by noting that Bowie and Carter had considered the ability of a forged check to victimize multiple persons and that the statutes in all three cases, while using the singular, necessarily include the plural by statutory mandate. (Morelos, supra, 168 Cal.App.4th at pp. 764-765.) In particular, the Fifth District stated: "The Attorney General argues that Bowie and Carter are inapposite since all the checks in both cases were drawn `on a single accounti.e., a single victim' and since `[n]either case considered the divisibility of possession of checks involving multiple victims.' Not so. Holding that `appellant possessed all 11 checks at the same time and was guilty of only 1 violation of ... section 475,' Bowie carefully observed that `there were 11 "potential victims."' (Bowie, supra, 72 Cal.App.3d at pp. 156-157.) Likewise, Carter reversed all but one possession count even though `it is possible that each check will victimize a different person.' (Carter, supra, 75 Cal.App.3d at p. 871.) In addition, as the fraud statutes in Bowie and Carter criminalize possession with intent to defraud of `any' check or `a' check, respectively, both cases acknowledge the statutory mandate that `the singular number includes the plural, and the plural the singular.' (§ 7; see Bowie, supra, 72 Cal.App.3d at p. 156; Carter, supra, 75 Cal.App.3d at p. 871.) [¶] Finally, Carter expressly rejected an analogous argument to the one the Attorney General raises here. `The Attorney General would distinguish Bowie upon the ground that the 11 blank checks in that case were identical, whereas the completed checks here were payable to different payees, and apparently were prepared for the commission of distinct frauds involving different victims. For the purpose of this analysis we accept the view that the merchant who cashes the forged check is likely to be the real victim of the fraud, rather than the drawee bank or the purported drawer whom the indictment named as the victim in all three counts.' (Carter, supra, 75 Cal.App.3d at p. 871.) As Carter reversed all but one of the three counts of possession of a completed check with intent to defraud even though there were three different victims, so we will reverse all but one of the blank check counts as to each defendant even though there were six different victims." (Morelos, supra, 168 Cal.App.4th at pp. 764-765.)
The defendant in Bowie sold 11 identical blank checks from a defunct corporation with the intent that the purchaser pass the checks to defraud other persons. (Bowie, supra, 72 Cal.App.3d at p. 146.) He was convicted of 11 *430 counts of violating former section 475.[2] (Bowie, at p. 146.) Division Five of the Second Appellate District affirmed one count and reversed the remaining 10 counts, stating: "The People cite no case supporting multiple counts in these circumstances. People v. Neder, [supra,] 16 Cal.App.3d 846, 852-853 ..., is distinguishable because it was a prosecution for forgery under Penal Code section 470 in which it was held that three separate forgeries on three separate sales slips charged on another person's credit card constituted separate offenses. Here the prosecution was based on possession, not forgery. Respondent's argument that there were 11 `potential victims' is not controlling in these circumstances." (Id. at pp. 156-157.)
In Carter, a manila folder was found in the defendant's car. (Carter, supra, 75 Cal.App.3d at p. 870.) Inside the folder were 19 completed checks, located in three separate envelopes each containing checks made out to a different payee. (Ibid.) The checks were all drawn from the same issuer. (See id. at pp. 869-871.) The trial court convicted the defendant of "three counts of possession of a completed check with intent to defraud" under former section 475a.[3] (Carter, at p. 868.) Division Four of the Second Appellate District found the reasoning of Bowie applicable and reversed two of the three counts. (Id. at p. 872.) In so doing, the Carter court rejected an attempt to distinguish Bowie on the basis of the multiple payees or the potential merchant cashers of the checks, and also held that the similarity of the blank and completed check statutes indicated that the Legislature intended to treat them similarly. (Id. at pp. 871-872.)
In summary, the Morelos court applied the Bowie and Carter interpretations of prerecodification statutes to interpret recodified section 475, subdivision (b), as a possessory offense in which only one offense lies irrespective of the number of checks possessed or variations among the checks. Because of the similar construction of subdivisions (b) and (c) of section 475, if we accepted this analysis then we would be required to reverse all but one of defendant's section 475 convictions. However, because recodification changed the plain language of section 475, and in so doing negated the Bowie court's distinction that possession of checks was not forgery, we disagree.
*431 In People v. Ryan (2006) 138 Cal.App.4th 360, 363-371 [41 Cal.Rptr.3d 277] (Ryan), the Fifth District examined the effect of the 1998 recodification on section 470. The Ryan court concluded that even though section 470 had been separated from "an undifferentiated, confusing recitation" of behavior constituting forgery into multiple subdivisions that described behavior deemed to be forgery, each subdivision only set out "different ways of committing a single offense, i.e., forgery." (Ryan, at p. 364.)
(5) While the Ryan court held that "the 1998 revision of section 470 did not change the law, either by intent or by language ..." (Ryan, supra, 138 Cal.App.4th at p. 367), the 1998 recodification did change the law by changing the language of section 475. Accordingly, section 475, including subdivision (c), now specifies just another way of committing the single offense of forgery. That is, making a fictitious check in violation of section 476, possessing it in violation of section 475, and then passing it in violation of section 470, collectively all amount to only a single forgery offense.[4]
(6) Forgery convictions are based upon the means used toward achieving fraud; thus, possession of multiple different checks with the intent to defraud multiple victims cannot be only one offense. It follows then that the ambiguous use of "any" in section 475 does not result in a construction that multiple potential frauds involving the violation of multiple victims' autonomy constitutes but one forgery because only one act of possession occurred. Accordingly, Morelos is not persuasive because it fails to acknowledge that section 475 offenses are now deemed to be forgery. Instead, section 475 must be interpreted to give effect to the language change and treat section 475 offenses as forgery offenses.
Accordingly, since possession of the checks violated the autonomy of the three issuers, as the means toward fraud, three convictions are appropriate.

III. AMENDMENT OF SECTION 4019 DURING PENDENCY OF APPEAL
(7) Defendant was granted custody credits under former section 4019, under which his conduct earned him "two days for every four days of actual presentence custody." (People v. Rodriguez (2010) 182 Cal.App.4th 535, 539 [105 Cal.Rptr.3d 345] (Rodriguez).) "[T]he Legislature amended section 4019 effective January 25, 2010, to provide that any person who is not required to register as a sex offender and is not being committed to prison for, or has not *432 suffered a prior conviction of, a serious felony ... or a violent felony ... may accrue conduct credit at the rate of four days for every four days of presentence custody." (Id. at pp. 539-540.) In a petition for rehearing, defendant contends that because his case is not yet final, he is entitled to retroactive benefit of the increased custody credits for good conduct.[5] We requested an answer to the petition; the People contend the amendment of section 4019 is not retroactive. This issue has split our sister districts. The Fifth District held in Rodriguez that the amendment was not retroactive. (Rodriguez, supra, 182 Cal.App.4th at p. 545.) The Third District held in People v. Brown (2010) 182 Cal.App.4th 1354, 1365 [107 Cal.Rptr.3d 286] (Brown) that the amendment was retroactive. Division Two of the First District agreed with the Third District in People v. Landon (2010) 183 Cal.App.4th 1096, 1106 (Landon). In People v. House (2010) 183 Cal.App.4th 1049, 1057 (House) Division One of the Second District also agreed with the Third District. In People v. Delgado (2010) 184 Cal.App.4th 271, 283 (Delgado) Division Six of the Second District sided with the Third District as well. We hold that the amendment to section 4019 was not retroactive.

A. Background

The amendment of section 4019 occurred in section 50 of Senate Bill No. 18 (2009-2010 3d Ex. Sess.). That bill ended with section 62, which stated that the "act addresses the fiscal emergency declared by the Governor...." (Stats. 2009-2010, 3d Ex. Sess. 2009, ch. 28, § 62.) "[T]he 2010 amendment to section 4019 contains no saving clause." (Rodriguez, supra, 182 Cal.App.4th at p. 541.)
(8) As an amendment to the Penal Code, the amendment of section 4019 "`is generally presumed to operate prospectively absent an express declaration of retroactivity or a clear and compelling implication that the Legislature intended otherwise. [Citation.]' [Citation.]" (People v. Alford (2007) 42 Cal.4th 749, 753 [68 Cal.Rptr.3d 310, 171 P.3d 32]; see also § 3 ["No part of [the Penal Code] is retroactive, unless expressly so declared."]; In re E.J. (2010) 47 Cal.4th 1258, 1272 [104 Cal.Rptr.3d 165, 223 P.3d 31] ["`[S]ection 3 reflects the common understanding that legislative provisions are presumed to operate prospectively, and that they should be so interpreted "unless express language or clear and unavoidable implication negatives the presumption." [Citation.]' [Citation.] `[I]n the absence of an express retroactivity provision, a statute *433 will not be applied retroactively unless it is very clear from extrinsic sources that the Legislature or the voters must have intended a retroactive application.' "].) However, "[w]here the Legislature has not set forth in so many words what it intended, the rule of construction should not be followed blindly in complete disregard of factors that may give a clue to the legislative intent. It is to be applied only after, considering all pertinent factors, it is determined that it is impossible to ascertain the legislative intent." (In re Estrada (1965) 63 Cal.2d 740, 746 [48 Cal.Rptr. 172, 408 P.2d 948] (Estrada).) Thus, "where the amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed." (Id. at p. 748.)

B. Reliance on Estrada and Credit Increases As a Mitigation in Punishment

In People v. Doganiere (1978) 86 Cal.App.3d 237, 240 [150 Cal.Rptr. 61] (Fourth Dist., Div. Two) (Doganiere) we held, on the basis of Estrada, that amendments to section 2900.5 to provide credit for section 4019 conduct credits were retroactive. (See also People v. Hunter (1977) 68 Cal.App.3d 389, 393 [137 Cal.Rptr. 299] (Hunter) [amendment to § 2900.5 to credit probation jail time to sentence, when probation is revoked, is retroactive].) This was based upon the conclusion that there is no legal significance between lessening the maximum sentence for a crime and increasing presentence credits, because both mitigate punishment. (See House, supra, 183 Cal.App.4th at p. 1057; Hunter, at p. 393.)
The majority opinions have all relied on Estrada and the mitigating effect of increasing the rate at which custody credits are earned to find that the amendment of section 4019 was retroactive. (See, e.g., Brown, supra, 182 Cal.App.4th at pp. 1363-1364; House, supra, 183 Cal.App.4th at p. 1057; Landon, supra, 183 Cal.App.4th at p. 1108.)

C. Limitations on Applying Estrada to Amendments to the Custody Credit Scheme

(9) In People v. Nasalga (1996) 12 Cal.4th 784, 797-798 [50 Cal.Rptr.2d 88, 910 P.2d 1380] (Nasalga) our Supreme Court applied Estrada to an amendment increasing the threshold amount for a sentence enhancement. The court's analysis stated, "The rule in Estrada has been applied to statutes governing penalty enhancements, as well as to statutes governing substantive offenses. [Citations.] Of particular relevance, courts have held that amendments... that mitigate punishment by increasing the dollar amount for certain crimes or enhancements, should be applied retroactively, in the absence of a saving clause or other indicia of a contrary legislative intent. *434 [Citations.]" (Id. at pp. 792-793, fn. omitted.) In a footnote, the Nasalga court referenced the dissent in a prior case "for a comprehensive list of cases that have applied Estrada." (Id. at p. 793, fn. 8.) The comprehensive list does not cite Doganiere or Hunter, and while citing the multiplicity of circumstances in which Estrada has been applied, none of the listed cases is described as involving an amendment to the custody credit scheme. (In re Pedro T. (1994) 8 Cal.4th 1041, 1054-1055, fn. 3 [36 Cal.Rptr.2d 74, 884 P.2d 1022].)
In In re Kapperman (1974) 11 Cal.3d 542, 544 [114 Cal.Rptr. 97, 522 P.2d 657], our Supreme Court reviewed an equal protection challenge to the prospective-only granting of credit for actual time served prior to the commencement of a prison sentence. The court held that equal protection was violated, but stated that "this case is not governed by cases (e.g., [Estrada]) involving the application to previously convicted offenders of statutes lessening the punishment for a particular offense." (Id. at p. 546.)
(10) Despite numerous cases applying Estrada, our Supreme Court has never cited either Doganiere or Hunter, and has never stated that increases to the custody credit scheme are a mitigation of punishment. Instead, our Supreme Court has been consistent in describing the custody credit scheme as a means of encouraging and rewarding behavior. (People v. Brown (2004) 33 Cal.4th 382, 405 [15 Cal.Rptr.3d 624, 93 P.3d 244] ["section 4019, focuses primarily on encouraging minimal cooperation and good behavior by persons temporarily detained in local custody ..."]; People v. Sage (1980) 26 Cal.3d 498, 510 [165 Cal.Rptr. 280, 611 P.2d 874] (conc. & dis. opn. of Clark, J.) ["The purpose of conduct credit is to foster good behavior and satisfactory work performance. [Citation.] That purpose will not be served by granting such credit retroactively."]; People v. Saffell (1979) 25 Cal.3d 223, 233 [157 Cal.Rptr. 897, 599 P.2d 92] ["The purposes of the provision for `good time' credits seem self-evident. First, and primarily, prisoners are encouraged to conform to prison regulations and to refrain from engaging in criminal, particularly assaultive, acts while in custody. Second, [prisoners are induced] to make an effort to participate in what may be termed `rehabilitative' activities."].) Thus, we conclude that increases in custody credits should not be considered a mitigation in punishment. Accordingly, the reasoning underlying our decision in Doganiere was flawed, as is the reasoning underlying Hunter, Landon, House, Brown and Delgado. Instead, because the custody credit scheme and, in particular, conduct credits are incentives or rewards for good behavior, increasing the rate at which credits are accrued does not represent a determination that a prior punishment was too severe. (See Rodriguez, supra, 182 Cal.App.4th at p. 543 ["it cannot be said that the punishment-reducing amendment at issue here `obviously' evinces a legislative determination that sentences for some felons are too severe, or that the Legislature intended a reduction in sentence for some felons should be *435 extended to all to whom it lawfully can be extended"].) Thus, Estrada does not apply, and there is no presumption of retroactivity. (See In re Kapperman, supra, 11 Cal.3d at p. 546.)

D. The Legislative Intent Is not Clear so the Amendment Is Prospective

Senate Bill No. 18 (2009-2010 3d Ex. Sess.) is explicit that it is intended to address a declared fiscal emergency. (Stats. 2009-2010, 3d Ex. Sess. 2009, ch. 28, § 62.) However, the purpose of an amendment is not necessarily indicative of a legislative intent for or against retroactivity. (See Nasalga, supra, 12 Cal.4th at p. 795 [increasing threshold amounts to address inflation only indicates consideration of decline of dollar and does not indicate intent for prospective application].) Thus, while applying the increased conduct credits retroactively would reduce prison populations and conserve financial resources more quickly than a prospective only amendment, the Legislature could also have determined that a prospective application better balanced public safety concerns and the need to conserve financial resources by reducing the prison population. (See Rodriguez, supra, 182 Cal.App.4th at pp. 542-543 [prospective amendment could reflect "proper balance between the state's fiscal concerns and its public safety concerns"].)
Similarly, our consideration of the operation of section 4019 also does not illuminate a legislative intent on the retroactivity issue. This is because section 4019 is a means of incentivizing and rewarding good behavior, but the Legislature may have concerned itself only with the fiscal effect of granting increased conduct credits, without consideration for the fact that recipients of retroactive credits were necessarily not responding to, or even aware of, the increased rate at which they were earning conduct credits. (See In re Stinnette (1979) 94 Cal.App.3d 800, 806 [155 Cal.Rptr. 912] ["it is impossible to influence behavior after it has occurred"]; Rodriguez, supra, 182 Cal.App.4th at p. 542.)
The courts finding the amendment of section 4019 to be retroactive have inferred legislative intent for retroactivity of the amendment to section 4019 from section 59 of Senate Bill No. 18 (2009-2010 3d Ex. Sess.), which acknowledges and addresses the likelihood of delays in implementation by the Department of Corrections and Rehabilitation. (Stats. 2009-2010, 3d Ex. Sess. 2009, ch. 28, § 59.) However, Senate Bill No. 18 was changing not just presentence credits but also a multitude of postsentence credits. Thus, while the administrative burden on the Department of Corrections and Rehabilitation to implement the new credits would be higher if increased credits are applied retroactively, the burden would remain high even if all the increases, *436 including section 4019, were applied prospectively. Accordingly, we infer no intent for retroactivity of the amendment of section 4019 from section 59 of Senate Bill No. 18.
We are also mindful of other potential indicators of intent. For instance, Senate Bill No. 18 (2009-2010 3d Ex. Sess.) was neither effective immediately as urgency legislation, nor was the effective date of operation delayed. (See Rankin v. Longs Drug Stores California, Inc. (2009) 169 Cal.App.4th 1246, 1257-1258 [87 Cal.Rptr.3d 543] [discussing weak inference for prospective application from delayed effective date].) The Legislature has also responded to undo the amendment of section 4019. To date, the Senate has unanimously passed its urgency legislation undoing the amendment of section 4019, and the Assembly's mirror version is in committee. (Sen. Bill No. 1487 (2009-2010 Reg. Sess.); Assem. Bill No. 1395 (2009-2010 Reg. Sess.).)
(11) Having searched for a legislative intent regarding prospective or retroactive application, we agree with the Fifth District that "there is no `"clear and compelling implication"' [citation] that the Legislature intended the amendatory statute at issue to apply retroactively. Accordingly, the section 3 presumption is not rebutted." (Rodriguez, supra, 182 Cal.App.4th at p. 544; see also In re E.J., supra, 47 Cal.4th at p. 1272 ["`[I]n the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic sources that the Legislature or the voters must have intended a retroactive application.'"].) Thus, the amendment to section 4019 applies prospectively and defendant is not entitled to an increase in his custody credits.

IV. COURT SECURITY FEES
Although not raised by the parties, we note that the trial court imposed only one $20 court security fee.
(12) Former section 1465.8, subdivision (a)(1), provided in relevant part that, "a fee of twenty dollars ($20) shall be imposed on every conviction for a criminal offense ...." (Italics added.) This language is mandatory. "Section 1465.8's legislative history supports the conclusion the Legislature intended to impose the court security fee to all convictions after its operative date." (People v. Alford, supra, 42 Cal.4th at p. 754, italics added.) This includes convictions in which the sentence was stayed pursuant to section 654. (People v. Crittle (2007) 154 Cal.App.4th 368, 371 [64 Cal.Rptr.3d 605].) Where no fee is imposed at all the judgment should be modified on appeal to include the fee. (People v. Crabtree (2009) 169 Cal.App.4th 1293, 1328 [88 Cal.Rptr.3d 41].)
*437 Accordingly, the judgment should be modified to include the $20 court security fee for each of the 36 counts of which defendant was properly convicted.

V. DISPOSITION
The convictions for counts 36, 38 through 43, and 45 through 61, are reversed. The judgment is modified to include the imposition of 35 additional $20 court security fees, for a total of thirty-six $20 court security fees or $720. The superior court clerk is directed to amend the sentencing minutes to reflect the reversed counts and set the court security fees at $720. The superior court clerk is also directed to prepare an amended abstract of judgment, including the addition of court security fees in box 11. Once amended, the superior court clerk is directed to forward a copy of the amended abstract to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.
McKinster, J., and Richli, J., concurred.
NOTES
[1] Unless otherwise noted, further statutory references will be to the Penal Code.
[2] Former section 475 provided that, "`Every person who ... has or keeps in his possession ... any blank or unfinished check, ... with intention to fill up and complete such blank and unfinished ... check, ... or procure the same to be filled up and completed in order to utter or pass the same, or to permit, or cause, or procure the same to be uttered or passed, to defraud any person, is punishable by imprisonment in the state prison ... or by imprisonment in the county jail for not more than one year.'" (Bowie, supra, 72 Cal.App.3d at p. 156.)
[3] Former section 475a provided that, "`Every person who has in his possession a completed check ... with intention to utter or pass the same ... to defraud any person, is punishable by imprisonment ....'" (Carter, supra, 75 Cal.App.3d at p. 868, fn. 1.)
[4] Of course, this one forgery offense could be charged in multiple counts specifying the different sections based upon alternative theories. (§ 954; Ryan, supra, 138 Cal.App.4th at p. 368.)
[5] Defendant claimed that his delay in raising this issue was because he was exhausting the issue with the trial court to satisfy section 1237.1. However, "`section 1237.1 only applies when the sole issue raised on appeal involves a criminal defendant's contention that there was a miscalculation of presentence credits. In other words ... section 1237.1 does not require a motion be filed in the trial court as a precondition to litigating the amount of presentence credits when there are other issues raised on direct appeal.' [Citations.]" (In re Antwon R. (2001) 87 Cal.App.4th 348, 351, fn. 1 [104 Cal.Rptr.2d 473] [Fourth Dist., Div. Two].)