185 Cal.App.4th 364 (2010)
THE PEOPLE, Plaintiff and Respondent,
v.
NORMAN KENNETH KEATING, Defendant and Appellant.
No. B210240.
Court of Appeals of California, Second District, Division Seven.
June 7, 2010.
*368 Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Scott A. Taryle and E. Carlos Dominguez, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
WOODS, J. 
Norman Kenneth Keating appeals his multiple convictions of grand theft, forgery, second degree commercial burglary and theft. The charges all stem from various transactions relating to a business that appellant and his partner, James Anderson, established in 2007. Appellant claims that his convictions were not supported by sufficient evidence. Specifically he asserts that the prosecution failed to present evidence that he had the specific intent to commit any of the charged crimes and that there was little evidence linking him to the commission of the crimes. Appellant claims that if any crimes were committed, his partner Anderson committed them. As we shall explain below, appellant has failed to demonstrate that his convictions were not supported by sufficient evidence. Circumstantial evidence presented during the trial supported appellant's convictions on all charges. Accordingly, we affirm.
In a petition for rehearing, filed the same day as our opinion denying the appeal of his convictions, appellant argues that he is entitled to the benefit of 2009 amendments to Penal Code section 4019 which went into effect on January 25, 2010, pursuant to Senate Bill No. 18 (2009-2010 3d Ex. Sess.) (Senate Bill 18). These amendments increased the good conduct credits *369 available to a defendant for presentence custody in a local detention facility. (Stats. 2009-2010, 3d Ex. Sess. 2009, ch. 28, § 50.) The amended statute became effective after appellant was sentenced and while this appeal was pending. Appellant argues the amendments must be applied retroactively to all sentences not yet final on appeal. We granted the petition for rehearing and now conclude that the amendments are retroactive and that appellant is accordingly entitled to recalculation of his presentence custody credits. We modify appellant's sentence accordingly and direct the abstract of judgment to be amended to correctly reflect the credits to which appellant is entitled.

FACTUAL AND PROCEDURAL BACKGROUND

Appellant's Business.
Appellant and James Anderson met in late 2006. At the time, Anderson owned a small printing business, Xpressprint located in Valencia (XPrint). Anderson and appellant developed a business plan for a new business called Xpresstoonmaps (XMaps). The business plan envisioned that XMaps would develop a "cartoon-like" map of Santa Clarita. XMaps would design and produce the map and would sell advertising spaces on the map to local businesses.
Anderson and appellant had equal ownership shares in XMaps and they incorporated the company together in late March 2007. XMaps and XPrint shared office space and Anderson and appellant also shared a condominium. Under the XMaps business plan, Anderson and appellant agreed to divide up the responsibility for XMaps. Initially, it was agreed that appellant would sell advertising spaces on the map and manage the sales force while Anderson would oversee the graphic design and manage the company funds, including writing checks and paying vendors and payroll.[1] In 2007 Anderson had an existing checking account for his company XPrint at Telesis Credit Union (Telesis). Anderson opened a checking account for XMaps at Telesis. The two accounts were linked, allowing funds to be transferred back and forth between the two businesses. Anderson had Internet access to the accounts, which were password protected with Anderson having sole access to the passwords. Anderson was also the signatory on both checking accounts. Anderson testified that while appellant was never authorized to sign checks on behalf of XPrint, he did authorize appellant to sign on his behalf on the XMaps account under certain circumstances, if he, Anderson was sick or *370 unavailable.[2] Although Anderson received the account statements for both Telesis accounts, he testified that he consulted appellant concerning management of the business and the company expenditures.
Appellant had the only debit card linked to the XMaps account at Telesis. Appellant used the debit card to pay for numerous business and personal purchases from March through August 2007. Appellant stated that he sold 90 to 95 percent of the sold spaces on the Santa Clarita map during the March through August 2007 time period and knew of the dollar amount of sales that came into XMaps during that time.
Although Anderson and appellant had agreed to divide the responsibilities for XMaps, ultimately appellant handled some of the financial transactions, including making deposits for both businesses. In addition, as the evidence presented at trial showed, appellant also dealt almost exclusively with certain XMap vendors, opened a bank account for XMaps at the Mission Valley Bank, and handled a few print orders for XPrint.

Grand Theft Charges (Counts 9 and 11): Express Personnel Services.
In March 2007, appellant and Anderson met with the owners of Express Personnel Services (EPS), Ray and Mary Flores. EPS provided personnel to businesses on a contract basis. Appellant signed the staffing agreement and credit application on behalf of XMaps with EPS to provide office staff for XMaps. EPS supplied a total of six staff people to XMaps from March 2007 to the middle of July 2007. Under the staffing agreement, EPS would pay each of its contract employees and then send an invoice to XMaps for payment.[3] Although the credit application indicated that Anderson was in charge of accounts payable for XMaps, the Floreses testified that they dealt exclusively with appellant on the account, and that they did not discuss account balances or invoices with Anderson. Anderson confirmed that appellant handled all of the dealings with EPS and that he had little interaction with EPS. The Floreses stated that they spoke to appellant weekly when they stopped by to distribute weekly paychecks to EPS staff working at XMaps.
Mr. Flores testified that by mid-April 2007 he began to have a number of conversations with appellant about unpaid invoices that EPS had sent to *371 XMaps.[4] During each discussion, appellant told Mr. Flores that he would look into the matter or that he would "take care of it." On a number of occasions, appellant told Mr. Flores that checks to pay the invoices had been "cut" and put in the mail.
On June 27, 2007, the Floreses met with appellant to discuss the unpaid invoices. Appellant told them he was unaware the invoices had been unpaid. Appellant later faxed copies of two unsigned checks made out to EPS dated June 22, 2007, one in the amount of $8,171.64 and another for $3,079.30. Appellant claimed that these checks had been mailed out the week before to EPS's out-of-state corporate headquarters. The checks, however, were never received by EPS. Appellant also told the Flores that checks to EPS totaling $22,000 would be sent to the corporate office the week of July 4, 2007.
After none of the promised payments arrived at the EPS corporate office, the Floreses met in person with appellant on July 12, 2007. During the meeting, appellant stated that he would obtain a check with "guaranteed funds" and would drop it off at EPS offices the next evening.[5]
Appellant also stated that he wanted to pay $39,000 of XMaps's outstanding balance on his credit card. The Floreses sent appellant a credit card authorization form via e-mail. The completed form, bearing appellant's signature and his "debit" card number was faxed back to EPS on the morning of July 13. The credit authorization indicated that appellant's "Mastercard" would expire in March 2008;[6] it also authorized EPS to charge the card five separate transactions in the amount of $9,999 on five separate dates a few days apart. Later on July 13, 2007, the Floreses were informed by their corporate headquarters that a $2,500 check (dated May 5, 2007) from XMaps had been returned for a second time for insufficient funds; the Floreses decided to remove their personnel from the XMaps's office. Both Floreses testified that until July 13, they had intended to continue the business relationship with XMaps and wanted to work something out with appellant.
*372 On the following Monday, July 16, Mary Flores received an e-mail from appellant in which he advised her that on advice of his legal counsel, he had cancelled his "credit" card.[7]

Forgery and Commercial Burglary Charges (Counts 12-15): Mission Valley Bank Check Transactions.
On July 19, 2007, appellant opened a corporate checking account at Mission Valley Bank in the name of XMaps. He deposited $100 cash into the account when he opened it. The next day he deposited $1,691.70 into the account. Appellant signed the signature card to open the account, and although Anderson's name was listed as a co-owner of the business and was also on the signature card, Anderson never signed the card. At trial, Anderson said that he had no interaction or dealings with Mission Valley Bank and testified that appellant never told him that they needed to deposit any funds into any account for XMaps at Mission Valley Bank.
On July 23, 2007, appellant entered the Sun Valley Branch of the Mission Valley Bank and deposited a check (#6036) in the account of XMaps for $5,618. The check was drawn on the XPrint's Telesis account. According to appellant, Anderson printed, signed and gave him the check and told him to put it in XMaps's account at the Mission Valley Bank. Mission Valley Bank had a policy to give a customer immediate credit for any amount they deposited without first verifying that the check had sufficient funds. Immediately after appellant deposited check #6036, he obtained a cashier's check drawn on XMaps's Mission Valley Bank account for $6,022 payable to Delta Printing Solutions, which was XMaps's landlord in Valencia.
Also on July 23, 2007, appellant entered a different branch of the Mission Valley Bank and deposited another check (#6035) in the account of XMaps for $4,368 drawn on the XPrint Telesis account. Appellant testified that Anderson gave him the check and told him to deposit it in XMaps's account in the Mission Valley Bank. Appellant immediately obtained a cashier's check in the amount of $3,011 payable to Delta Printing Solutions.
Both checks #6035 and #6036 were returned marked "NSF."
Although when initially interviewed by police Anderson said that the signatures on both checks looked like his signature or could be his signature, he also stated that he had no recollection of signing the checks or printing them. At trial, Anderson stated that the checks did not contain his signature. *373 Anderson denied he printed or signed either check. He also stated that he did not authorize appellant to sign the checks. He further testified that given the size of the business and the large amount of the checksnearly $10,000 in one dayif he had signed them he would remember the transaction.

Theft Charges (Counts 16-18) Mission Valley Bank Credit Card Charges.
In 2007, Carrie Burrell was marketing director for Mission Valley Bank in the Sun Valley Branch. In 2007, she placed two orders for pens with XPrintone order for 6,000 pens at a cost of $2,500 and a second order for 500 pens costing $600. She placed the order with appellant and authorized him to charge Mission Valley Bank's credit card for the purchases. Burrell testified although she spoke with others working at XPrint about the order, she believed that she gave appellant the credit card number and that appellant called her on the telephone and instructed her to pay for the orders "up-front." The Mission Valley Bank credit card was charged for both orders in June 2007. Burrell received the larger order of pens, but never received the other order.
On August 7, 2007, XPrint charged the Mission Valley Bank credit card for $2,508.32 and on August 22, XPrint charged the Mission Valley Bank credit card for $1,650. Neither charge was authorized by Mission Valley Bank. Burrell testified that when she received the August statement for the Mission Valley Bank credit card and saw the unauthorized charges she called appellant. He apologized and blamed it on a "bookkeeping" error. He told her that the card would receive a credit for both charges. At the end of the month the credit card had not been credited notwithstanding appellant's assurances. Thereafter, on September 11, 2007, XPrint charged the Mission Valley Bank credit card in the amount of $1,059; this charge was also not authorized by the bank. When Burrell discovered the September charge, she called appellant again. He apologized and blamed it on a "personnel error." Burrell cancelled the card and submitted a fraud claim concerning the charges. She testified that she never made any credit card transactions on her own and was unaware that the charges were not authorized.
Anderson testified that he was not involved with the Mission Valley Bank pen orders, and that appellant had handled the Mission Valley Bank orders on behalf of XPrint. He testified that appellant had access to the XPrint credit card machine and that both XMaps and XPrint used the same credit card terminal. Anderson said that he knew nothing about the credit card charges for the Mission Valley Bank pen orders at the time. Anderson did recall later discussing the September 11 charge with appellant. Anderson testified that appellant told him the September 11 charge on the Mission Valley Bank card was for "advertising."
*374 At trial appellant conceded that he handled the Mission Valley Bank pen order in 2007. He denied, however, that Burrell gave him the Mission Valley Bank credit card numbers. He stated that the card number was "on-file." He further testified that if he did direct a Ms. Diaz to charge the card in August, it was only because he did not realize the bank had already paid for the order. He denied that he directed Diaz to charge the Mission Valley Bank credit card on August 22 or September 11.

Appellant's Arrest and Trial.
Appellant was arrested in November 2007. He was charged in count 9 with grand theft of labor of EPS in violation of Penal Code[8] section 487, subdivision (a); in count 11 of grand theft in violation of former section 484g, subdivision (a); in counts 12 and 14 of forgery in violation of section 475, subdivision (c); in counts 13 and 15 second degree commercial burglary of Mission Valley Bank in violation of section 459; and in counts 16, 17 and 18 of theft in violation of section 484e, subdivision (d).[9]
The case proceeded to a bench trial. Appellant testified. He denied all wrongdoing and pointed out that Anderson made numerous transfers of funds from XMaps's Telesis bank account to the XPrint account. Appellant testified that if Anderson had not made the transfers that XMaps would have had sufficient funds to pay its share of the business expenses. Appellant testified that he had no knowledge of various account balances and believed that XMaps had enough funds to pay its bills based on the amount of sales he brought into the company. He testified that XPrint never brought in enough money to cover its expenses. Appellant argued that Anderson was responsible for paying the bills and monitoring all of the accounts. Appellant testified that he had no access to the accounts and did not benefit from these crimes. Appellant argued that Anderson was a poor manager of funds and spent funds from both companies on personal items. Appellant admitted that from 1996 to 2006 he had suffered four prior felony convictions in the State of Florida for grand theft and for checks returned for insufficient funds.

*375 Appellant's Sentence and Appeal.

The court found appellant guilty on all counts. On July 23, 2008, the court sentenced him to a total of five years in state prison and ordered him to pay restitution. At the time of sentencing the trial court determined appellant's presentence credits to be 253 days of actual custody credit and 126 days of conduct credit, for a total of 379 days.[10]
Appellant filed an appeal of his convictions on August 15, 2008.
On February 5, 2010, while the appeal was pending in this court, Keating filed a motion in the trial court seeking a modification of the judgment and a recalculation of his presentence conduct credits. Appellant claimed that he was entitled to additional conduct credits in light of an amendment to section 4019, pursuant to which the formula for calculating presentence conduct credits was changed from two days for every four days of actual custody to two days for every two days of time served. The lower court denied appellant's motion.
On March 15, 2010, this court filed its opinion affirming the judgment on appellant's convictions. The same day, appellant filed a petition for rehearing, seeking the benefit of 2009 amendments to section 4019, which took effect in January 2010. Those amendments, with certain exceptions not applicable here, increase the good conduct credits a defendant can receive for presentence custody. Appellant contends that the amendments, which became effective in January 2010, must be retroactively applied to his case. We granted the petition for rehearing, vacated our previously filed opinion, and ordered supplemental briefing.

DISCUSSION
Before this court appellant challenges the evidence supporting his convictions. He further also claims that he is entitled to additional conduct credits in view of the 2009 amendment to section 4019, which he argues should be retroactively applied. We turn our attention first to appellant's convictions.

I. Appellant's Challenge to the Sufficiency of the Evidence Supporting His Convictions.

Appellant claims that the sufficiency of the evidence presented at trial did not support his convictions. He argues that the prosecution failed to present *376 any evidence linking him to the crimes or prove that he had the specific intent to commit the crimes charged. He claims that if any crimes were committed, Anderson committed them.

A. Standard of Review.

"It is the prosecution's burden in a criminal case to prove every element of a crime beyond a reasonable doubt. [Citation.] To determine whether the prosecution has introduced sufficient evidence to meet this burden, courts apply the `substantial evidence' test." (People v. Cuevas (1995) 12 Cal.4th 252, 260 [48 Cal.Rptr.2d 135, 906 P.2d 1290].) Under this standard, this court "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence-that is, evidence which is reasonable, credible, and of solid value-such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (People v. Johnson (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].)
"`[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction ... [is] to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.' [Citation.] Explaining this standard the [United States Supreme Court has] said that `this inquiry does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (People v. Johnson, supra, 26 Cal.3d at p. 576, italics omitted, quoting Jackson v. Virginia (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 99 S.Ct. 2781].)
"The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] `"Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt."'" (People v. Rodriguez (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618].)
A single witness's testimony is sufficient to support a conviction, unless it is physically impossible or inherently improbable. (People v. Young (2005) 34 Cal.4th 1149, 1181 [24 Cal.Rptr.3d 112, 105 P.3d 487]; People v. Scott (1978) 21 Cal.3d 284, 296 [145 Cal.Rptr. 876, 578 P.2d 123]; Evid. Code, § 411.) "Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the [substantial evidence] standard *377 is sufficient to uphold the finding." (People v. Barnwell (2007) 41 Cal.4th 1038, 1052 [63 Cal.Rptr.3d 82, 162 P.3d 596].) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the ... jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (People v. Maury (2003) 30 Cal.4th 342, 403 [133 Cal.Rptr.2d 561, 68 P.3d 1].) With this standard in mind we turn to appellant's claims.

B. Grand Theft of Express Personnel Services.

Count 9. Appellant was convicted of grand theft of labor in violation of section 487, subdivision (a) which provides: "Grand theft is theft committed in ... [¶] (a) When the money, labor, or real or personal property taken is of a value exceeding four hundred dollars ($400) ...." "Theft" is defined in section 484, subdivision (a) as: "(a) Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft." (§ 484, subd. (a).)
(1) Before this court, appellant argues that his conviction cannot stand. He argues although EPS was not paid for the personnel services it provided to XMaps, there was no evidence that he had the specific "intent" to steal labor from EPS. (See People v. Rizo (2000) 22 Cal.4th 681, 686 [94 Cal.Rptr.2d 375, 996 P.2d 27] [specific intent crime "not only specifies a proscribed act but also refers to an `intent to ... achieve some additional consequence'"].)
"`[I]ntent is inherently difficult to prove by direct evidence. Therefore, the act itself together with its surrounding circumstances must generally form the basis from which the intent of the actor may legitimately be inferred.'" (People v. Smith (1998) 64 Cal.App.4th 1458, 1469 [76 Cal.Rptr.2d 75] [attempt to make purchase with counterfeit credit card substantial evidence of intent to defraud]; see also People v. Castellanos (2003) 110 Cal.App.4th 1489, 1493-1494 [2 Cal.Rptr.3d 544] [possession of counterfeit resident alien card bearing defendant's photograph substantial evidence of intent to defraud]; People v. Norwood (1972) 26 Cal.App.3d 148, 159 [103 Cal.Rptr. 7] *378 [possession of multiple stolen or forged instruments for the payment of money and a driver's license in another's name substantial evidence of fraudulent intent].)
The circumstances of appellant's interactions with EPS and the Floreses provide substantial evidence of his criminal intent. Notwithstanding the fact that appellant and Anderson initially agreed that Anderson would handle accounts payable and monitor the vendors, it was appellant who signed the contract with EPS on behalf of XMaps. Appellant exclusively monitored the business relationship with the Floreses from March 2007 through the end of the relationship in July 2007. On more than one occasion appellant told EPS that he would investigate the unpaid invoices and make sure they were paid. On June 27, 2007, appellant faxed EPS copies of two unsigned checks and represented to the Floreses that these checks had been issued, signed and sent to EPS headquarters the week before. Appellant also promised to provide a check for guaranteed funds on the evening of July 13, 2007, and appellant further told the Floreses that he would pay a portion of the balance on his credit card. Thereafter a credit card authorization was sent to EPS offices containing appellant's card information and requesting certain charge arrangements over a period of time. Appellant's testimony at trial that he had no intent to defraud EPS is belied by the fact that appellant failed to follow through on his promises of payment and that appellant attempted to pay part of the outstanding balance with a debit card that had expired in March 2007 from an account that had been closed in 2005. As a matter of common sense, the court as the trier of fact could have concluded that the most likely if not the only purpose for which appellant had undertaken such actions and made so many unfulfilled promises to pay was for the commission of theft. (See People v. Carter (1977) 75 Cal.App.3d 865, 870 [142 Cal.Rptr. 517] [defendant's possession of forged checks and an identification card bearing defendant's photo and one of the names from the checks "leaves no doubt about his fraudulent intent"].)
At trial and before this court, appellant has argued, however, he was not culpable because Anderson testified that he intended for EPS to be paid and also that he had a concern that EPS had overcharged XMaps. But it is also clear that Anderson was not involved in XMaps's relationship with EPS, had no information about the various transactions and that any dispute over the invoices in no way motivated appellant's conduct with respect to the EPS bills. Appellant continually reassured EPS of payment and never disputed any invoice, and yet, appellant never followed through with payments. Instead, as the evidence demonstrated, appellant provided EPS with information he knew to be false in an apparent effort to prolong XMaps's business relationship with EPS. Appellant's conviction is supported by substantial evidence.
*379 Count 11. Appellant was convicted on count 11 of a violation of former section 484g which provided: "Every person who, with the intent to defraud, (a) uses, for the purpose of obtaining money, goods, services, or anything else of value, an access card or access card account information that has been altered, obtained, or retained in violation of Section 484e or 484f, or an access card which he or she knows is forged, expired, or revoked, or (b) obtains money, goods, services, or anything else of value by representing without the consent of the cardholder that he or she is the holder of an access card and the card has not in fact been issued, is guilty of theft. If the value of all money, goods, services, and other things of value obtained in violation of this section exceeds four hundred dollars ($400) in any consecutive six-month period, then the same shall constitute grand theft."
This count centers on the evidence that appellant provided EPS with the credit authorization containing his expired debit card number, containing a representation that the card had not yet expired and a request that EPS charge the card to pay XMaps's unpaid invoices. This count was supported by the testimony of Mary and Ray Flores who stated that appellant told them he wanted to pay $39,000 of XMaps's outstanding balance using his credit card. Thereafter, Mary Flores received the completed credit card authorization form from appellant's office that contained appellant's signature and a "MasterCard" number and an authorization to make five separate charges on the card. She stated that she discussed the charges with appellant and that after EPS removed their employees from XMaps's worksite, appellant sent her an e-mail in which he referred to the credit card and told her that on advice of legal counsel he had "cancelled" the card. Even though at trial appellant denied that he had completed the credit authorization form or otherwise authorized the use of the card, the evidence was undisputed that the debit card number provided on the form belonged to appellant and that the card had expired in March 2007.
(2) As to this count appellant claims that there was no evidence he "used" the credit card in violation of the Penal Code because he informed EPS that the card was cancelled before EPS attempted to charge the card and because he did not attempt to obtain anything of value since XMaps had already received the labor before he gave them the card number. Appellant's argument is without merit. Section 484g criminalizes the use of the card that a person knows is expired. Here there was evidence not only that the card had expired, but also that appellant was aware that it was expired well prior to July 2007. (See People v. Love (2008) 166 Cal.App.4th 1292, 1297-1298 [83 Cal.Rptr.3d 428] [fraudulent use of a credit card was a completed offense even though the unauthorized transaction was cancelled and never completed].) Also, it is clear that all parties intended to continue the business relationship if XMaps paid the invoices and that even though appellant's *380 debit card was being used to pay an overdue invoice, the business relationship was ongoing at the time appellant offered to make the payment using his card.
In our view, the trial court could reasonably infer based on this evidence that appellant intended to defraud EPS. The evidence is sufficient to support his conviction on count 11.

C. Forgery and Commercial Burglary in Connection with Mission Valley Bank Check Deposit Transactions.

In counts 12 through 15 appellant was charged with forgery in violation of section 475, subdivision (c)[11] and commercial burglary in violation of section 459[12] in connection with appellant's July 23, 2007 deposit into XMaps's account at the Mission Valley Bank, checks #6035 and #6036 drawn on XPrint's Telesis checking account. Both checks were returned for insufficient funds.
At trial the People prosecuted these crimes based on the theory that appellant forged Anderson's signature on the XPrint checks, brought them into Mission Valley Bank and deposited them into XMaps's account. In the alternative, the People attempted to show that appellant deposited the XPrint checks into XMaps's Mission Valley Bank account knowing that the XPrint checks would be returned for insufficient funds.
In our view, sufficient evidence presented at trial supported the forgery theory. Appellant admitted that he deposited the two checks in the XMaps's account at the Mission Valley Bank. But appellant testified that Anderson had signed and given appellant the checks to make the deposit.
*381 Though Anderson admitted that when he was first interviewed by police he told them that it could be his signature on the checks, Anderson did not equivocate at trial. Instead Anderson stated that the checks did not contain his signature. Anderson denied he printed or signed either check. He also stated that he did not authorize appellant to sign the checks. He further testified that given the size of the business and the large amount of the checksnearly $10,000 in one dayif he had signed them, he would remember the transactions. The testimonies of appellant and Anderson are at odds. The duty to resolve this conflict and the credibility assessments it presents belong to the trier of facthere the trial court. (People v. Maury, supra, 30 Cal.4th at p. 403 ["[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends."].)
The trial court's judgment on these counts suggests it adopted Anderson's version. Appellant has not demonstrated to this court that Anderson's testimony was physically impossible or inherently improbable or unreasonable. Thus, we conclude the evidence in the record could reasonably support the trial court's judgment on these charges.

D. Mission Valley Bank Credit Card Theft Charges.

In counts 16 through 18 appellant was convicted of three counts of theft in violation of section 484e[13] for the unauthorized charges on August 7, 22 and September 11, 2007, of Mission Valley Bank's credit card. Sufficient evidence supports appellant's convictions on these counts.
The evidence presented at trial showed that appellant arranged for the Mission Valley Bank pen orders and that appellant asked the bank to pay for the orders at the time the orders were placed in June 2007. According to the Mission Valley Bank marketing director, Carrie Burrell, she worked with appellant on the order; she provided him with the credit card number and authorized the charges, which were incurred and paid in June 2007. Burrell *382 also contacted appellant after she discovered the unauthorized charges in August and September. Each time appellant assured her the charges were a mistake and that the problem would be corrected. However, the bank never received any credit. Ms. Diaz, who worked for XMaps and XPrint, testified that, although several people had access to XPrint's credit card terminal, she would have charged the credit card only if directed to do so by appellant. She further testified that appellant never directed her to "credit" the bank's charge card. Similarly Anderson testified that he was unaware of the unauthorized charges and had no involvement in the pen orders from Mission Valley Bank. He did, however, recall discussing the September 11 charge with appellant, but according to Anderson, appellant told him the charge was for "advertising" expenses.
Based on all of the evidence, the court could reasonably conclude that, notwithstanding appellant's testimony to the contrary, appellant was responsible[14] for the unauthorized charges to Mission Valley Bank's card; his fraudulent intent could be inferred from his repeated reassurances to Burrell followed by his failure to rectify the situation. "Even if the evidence could be reconciled with a different finding, that does not justify a conclusion that the [trier of fact's] verdict was not supported by the evidence, nor does it warrant a reversal." (People v. Romero (2008) 44 Cal.4th 386, 400 [79 Cal.Rptr.3d 334, 187 P.3d 56].) For these reasons, we conclude that the court's judgment on counts 16 through 18 is based on sufficient evidence.
In conclusion, we note that based on the evidence presented at trial it appears that XMaps and XPrint were poorly managed businesses. Neither appellant nor Anderson regularly monitored the finances of the companies. Both men expended the businesses' funds for personal use. Neither business generated sufficient revenue to sustain their respective enterprises in the long term. Furthermore, whether Anderson played some role in mismanagement of XMaps that ultimately resulted in the criminal charges against appellant or whether Anderson engaged in uncharged misdeeds, is beside the point and ultimately beyond our purview here. Irrespective of Anderson's involvement, the evidence presented at trial was sufficient to prove the specific charges against appellant.

II. Retroactivity of 2009 Amendments to Section 4019.

(3) Appellant was sentenced August 18, 2008, to five years in state prison. At sentencing, the trial court determined that appellant had spent 253 *383 days in presentence custody and that he was therefore entitled to 126 days of credit under the then current version of section 4019, which provided for two days of credit for every four days of custody unless the inmate failed to perform assigned work or abide by the facility's reasonable rules and regulations. (Former § 4019, subds. (a)(4), (b), (c), (f), as amended by Stats. 1982, ch. 1234, § 7, p. 4553.) Effective January 25, 2010, section 4019 now provides for up to two days of credit for every two days of custody under the same conditions (with exceptions not relevant here). (§ 4019, subds. (a)(4), (b)(1), (c)(1), (f).) If sentenced under the current version of section 4019, appellant would be entitled to another 126 days of credit for a total of 252 days of local conduct credit.
The issue of whether the recent amendments to section 4019 apply retroactively, or only prospectively, has been addressed in a number of published opinions. The Fifth District in People v. Rodriguez[*] (2010) 183 Cal.App.4th 1 [107 Cal.Rptr.3d 460] (Rodriguez), and in Division Two of the Fourth District in People v. Otubuah (2010) 184 Cal.App.4th 422 (Otubuah) ruled that the amendments do not apply retroactively. However, in this district, Division One, in People v. House (2010) 183 Cal.App.4th 1049 [107 Cal.Rptr.3d 830] and Division Six in People v. Delgado (2010) 184 Cal.App.4th 271 [108 Cal.Rptr.3d 789] have reached the opposite conclusion, holding that the amendments are retroactive. The Third District and First District (Divisions Two, Three and Five) have also held that the amendment to section 4019 should be retroactively applied to individuals whose judgments have not yet become final. (People v. Brown[dagger;] (2010) 182 Cal.App.4th 1354 [107 Cal.Rptr.3d 286] (Brown); People v. Landon (2010) 183 Cal.App.4th 1096 [107 Cal.Rptr.3d 343]; People v. Pelayo (2010) 184 Cal.App.4th 481 [108 Cal.Rptr.3d 825]; People v. Norton (2010) 184 Cal.App.4th 408.) As we shall explain, we join Divisions One and Six of this district and the majority view that the amendments apply retroactively.

A. Retroactivity of Penal Statutes in General.

(4) "To ascertain whether a statute should be applied retroactively, legislative intent is the `paramount' consideration ...." (People v. Nasalga (1996) 12 Cal.4th 784, 792 [50 Cal.Rptr.2d 88, 910 P.2d 1380] (Nasalga).) Whether the Legislature intended a statute to operate retroactively is a question of law that we decide independently. (In re Chavez (2004) 114 Cal.App.4th 989, 994 [8 Cal.Rptr.3d 395].) In this case, the Legislature did not expressly state whether it intended that the amendments to section 4019 be given retroactive *384 effect. We therefore look to other factors to discern legislative intent. (In re Estrada (1965) 63 Cal.2d 740, 744 [48 Cal.Rptr. 172, 408 P.2d 948] (Estrada).)
We begin by considering the relevant principles governing our analysis. The Attorney General relies on section 3 in contending we must presume the amendments to section 4019 were intended to apply prospectively only, absent express legislative intent or a "clear and unavoidable implication" to the contrary. (See § 3 ["No part of [the Penal Code] is retroactive, unless expressly so declared."].) Under section 3, "`[a] new statute is generally presumed to operate prospectively absent an express declaration of retroactivity or a clear and compelling implication that the Legislature intended otherwise. [Citation.].' [Citation.]") (People v. Alford (2007) 42 Cal.4th 749, 753 [68 Cal.Rptr.3d 310, 171 P.3d 32].)
Appellant maintains, however, relying on Estrada and its progeny, that "[a]bsent a saving clause, a criminal defendant is entitled to the benefit of a change in the law during the pendency of his appeal." (See People v. Rossi (1976) 18 Cal.3d 295, 299-300 [134 Cal.Rptr. 64, 555 P.2d 1313]; People v. Babylon (1985) 39 Cal.3d 719, 722 [216 Cal.Rptr. 123, 702 P.2d 205]; People v. Wright (2006) 40 Cal.4th 81, 90 [51 Cal.Rptr.3d 80, 146 P.3d 531], relying on People v. Trippet (1997) 56 Cal.App.4th 1532, 1544-1545 [66 Cal.Rptr.3d 559].)
(5) As the Attorney General concedes, the court in Estrada carved out an exception to section 3 when the Legislature enacts a provision lessening punishment: "`[W]here the amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed'" (the rule in Estrada). (See Estrada, supra, 63 Cal.2d at p. 748.)
In Estrada, the court explained: "[Section 3] simply embodies the general rule of construction, coming to us from the common law, that when there is nothing to indicate a contrary intent in a statute it will be presumed that the Legislature intended the statute to operate prospectively and not retroactively. That rule of construction, however, is not a straitjacket. Where the Legislature has not set forth in so many words what it intended, the rule of construction should not be followed blindly in complete disregard of factors that may give a clue to the legislative intent." (Estrada, supra, 63 Cal.2d at p. 746.) The court emphasized that section 3 "is to be applied only after, considering all pertinent factors, it is determined that it is impossible to ascertain the legislative intent." (63 Cal.2d at p. 746.)
(6) In considering an amendment reducing the penalty for a prison escape, the court concluded "the Legislature must have intended that the *385 amendatory statute should operate in all cases not reduced to final judgment at the time of its passage." (Estrada, supra, 63 Cal.2d at p. 746.) The court reasoned: "When the Legislature amends a statute so as to lessen the punishment[,] it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply." (Id. at p. 745.) "This intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology," which instruct that punishment is directed toward deterrence, incapacitation, and rehabilitation, but not "`punishment for its own sake.'" (Id. at p. 745.)
In other words, "`[a] legislative mitigation of the penalty for a particular crime represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law ...,'" and when a lesser penalty has been deemed sufficient to satisfy the public interest, the Legislature obviously intends that no prisoner remain subject to the original, greater penalty. (Estrada, supra, 63 Cal.2d at p. 745; see Nasalga, supra, 12 Cal.4th at p. 792 ["`Ordinarily, when an amendment lessens the punishment for a crime, one may reasonably infer the Legislature has determined imposition of a lesser punishment on offenders thereafter will sufficiently serve the public interest.'"], quoting In re Pedro T. (1994) 8 Cal.4th 1041, 1045 [36 Cal.Rptr.2d 74, 884 P.2d 1022].) In these circumstances, "the rule of construction that statutes are normally to be interpreted to operate prospectively and not retroactively ... has been rebutted." (Estrada, at p. 747; accord, People v. Floyd (2003) 31 Cal.4th 179, 185 [1 Cal.Rptr.3d 885, 72 P.3d 820].)[15]
*386 Accordingly, in this case the determination of whether the Estrada rule applies therefore turns on the effect and purpose of the amendment itself, not simply the underlying purpose of the law amended. Thus, if section 4019, as amended, constitutes an "amendatory statute that mitigates punishment" within the meaning of Estrada, it will be given retroactive effect unless the Legislature has "clearly signal[ed] its intent to make the amendment prospective, by the inclusion of either an express saving clause[16] or its equivalent." (Nasalga, supra, 12 Cal.4th at p. 793.)
The Attorney General contends the rule in Estrada does not apply here because it is not clear that the amendment to section 4019 is an amendatory statute lessening punishment. The question before us, therefore, is whether the general presumption of prospectivity in Penal Code Rule 3 or the rule in Estrada controls our construction of section 4019, as amended. As we shall explain, we believe the Estrada rule applies.

B. Retroactivity of Statutes Increasing Custody Credits.

In four prior decisions long predating the current amendments, Courts of Appeal have held that the Estrada rule applied to amendments increasing the credits a defendant could receive for presentence custody. (People v. Hunter (1977) 68 Cal.App.3d 389, 391-393 [137 Cal.Rptr. 299] (Hunter); People v. Sandoval (1977) 70 Cal.App.3d 73, 87-88 [138 Cal.Rptr. 609] (Sandoval); People v. Doganiere (1978) 86 Cal.App.3d 237, 238-240 [150 Cal.Rptr. 61] (Doganiere); People v. Smith (1979) 98 Cal.App.3d 793, 798-799 [159 Cal.Rptr. 749] (Smith).) No published decisions, other than the recently decided Rodriguez and Otubuah, have held to the contrary.
In Hunter, the issue was whether amendments to section 2900.5, which allowed credit for actual time spent in presentence custody against sentences imposed as a condition of probation, applied retroactively to probationary sentences imposed prior to the effective date of the amendments. (Hunter, supra, 68 Cal.App.3d at p. 391.) Following Estrada, the court held the amendments applied retroactively to judgments that were not yet final on the effective date of the new law. (Ibid.)[17]
In Doganiere, the issue was the retroactivity of amendments to section 2900.5 that authorized conduct credit (pursuant to § 4019) for time that had *387 been served in jail as a condition of probation against a sentence later imposed after a violation of probation. (Doganiere, supra, 86 Cal.App.3d at pp. 238-239.) Following Estrada and Hunter, the court held the amendments were retroactive. (Id. at pp. 239-240.) In Doganiere, the court specifically rejected an argument that the amendments should not apply retroactively because conduct credits were an incentive for future inmate behavior, a goal that could only be accomplished through prospective application. (Doganiere, supra, 86 Cal.App.3d at pp. 239-240.) "It appears to us that in applying the principles of Estrada, as indeed we must, the Legislature simply intended to give credit for good behavior and in so doing, dangled a carrot over those who are serving time. It would appear to be fair, just and reasonable to give prisoner A, who has been a model prisoner and by reason thereof served only five months of his six-month sentence, credit for the full six months if we are going to give credit for the full six months to prisoner B, who is recalcitrant, hard-nosed, and spent his entire time violating the rules of the local county jail." (Ibid.) We note that Estrada itself implicitly rejected a similar argument made by the dissent in that case, that retroactive application of a lessened criminal penalty undermines the deterrent effect of penal statutes. (See Estrada, supra, 63 Cal.2d at p. 753 (dis. opn. of Burke, J.).) Doganiere concluded, "[u]nder Estrada, it must be presumed that the Legislature thought the prior system of not allowing credit for good behavior was too severe." (Doganiere, 86 Cal.App.3d at p. 240.)[18]
Here the Attorney General contends that the reasoning of Doganiere is unsound, since the public purpose of good conduct statutes is to provide effective incentives for good behavior, and that this purpose can only be furthered by prospective application of additional credits. The Attorney General relies on Rodriguez, which quoted In re Stinnette (1979) 94 Cal.App.3d 800 [155 Cal.Rptr. 912] (Stinnette), in support of this contention"[r]eason dictates that it is impossible to influence behavior after it has occurred." (Stinnette, supra, 94 Cal.App.3d at p. 806; see also Rodriguez, supra, 183 Cal.App.4th at p. 8.) Stinnette considered an amendment to section 2931 under the Determinate Sentencing Act (DSA), which allowed prisoners to earn conduct credits but restricted application of the amendment to time served after the effective date. (Stinnette, supra, 94 Cal.App.3d at pp. 803-804.) The issue was whether the express prospective application of the statute violated equal protection. (Id. at p. 804.) The court concluded that it did not because there was a rational basis for treating those who had already begun serving their sentences differently from those who began serving their sentences after the effective date. (Id. at pp. 805-806.) Unlike *388 Stinnette, the amendment to section 4019 at issue here does not specify the Legislature's intent regarding its retroactive or prospective application. Consequently, Stinnette is simply of no assistance in determining the Legislature's intent when amending section 4019.
The Legislature, which is presumed to have been aware of the Hunter/Doganiere case law, "has taken no action, as it easily could have done, to abrogate" these decisions in the more than 31 years since the last of them was decided. (Nasalga, supra, 12 Cal.4th at p. 792, fn. 7.) Moreover, the Legislature twice amended section 4019, in 1982 and 2009, without expressly providing that the amendments would apply prospectively only. (Stats. 1982, ch. 1234, § 7, p. 4553; Stats. 2009-2010, 3d Ex. Sess. 2009, ch. 28, § 50.) On these facts, we may infer that the Legislature has acquiesced in Doganiere. (See Meloney, supra, 30 Cal.4th at p. 1161.)
(7) In our view section 4019, as amended, is a statute lessening punishment, as it effectively operates to reduce the sentences of qualified prisoners. Under section 4019, a prisoner accrues time for good conduct that is "deducted from his or her period of confinement ...." (§ 4019, subds. (b)(1) & (c)(1).) The amendments to this section increase the rate at which a prisoner accrues such time against his sentence, which will necessarily shorten sentences. We are not persuaded a provision that necessarily reduces the sentences of qualified prisoners is any less an "amendatory statute that mitigates punishment" simply because it achieves this end by increasing sentencing credits. Our conclusion is in accord with Hunter and Doganiere and their progeny, holding that provisions affording or increasing sentencing credit are statutes lessening punishment under Estrada. Our sister divisions in this district and the First and Third District Courts of Appeal recently reached the same conclusion in considering the 2009 amendments to section 4019. (See, e.g., Brown, supra, 182 Cal.App.4th 1354, 1363-1364 ["Whatever the ultimate purpose or purposes of the amendment to section 4019, the effect of the amendment is to reduce the overall time of imprisonment, and, thus, the punishment, for those less serious offenders who have demonstrated good behavior while in custody. A prisoner released from prison one day sooner has been punished one day less in prison than he would have been had there not been a change in the law."].)
(8) As we conclude that section 4019, as amended, mitigates punishment, Estrada controls. Under Estrada, we deem the Legislature to have found the sentences reduced by the additional conduct credit "`sufficient to meet the legitimate ends of the criminal law'" for qualified prisoners. (Estrada, supra, 63 Cal.2d at p. 745.) The same "inevitable inference" follows: the Legislature intended the shorter sentences to apply retroactively. (Ibid.)
*389 In so holding, we have also considered but disagree with decisions to the contrary by our colleagues in the Fifth District and the Fourth District.
(9) In Rodriguez, relied upon by the Attorney General, the Fifth District held that Estrada did not apply to section 4019, as amended, because "it is not obvious that the Legislature has determined the punishment for [qualified prisoners] was too severe, nor is it an inevitable inference that the Legislature intended its punishment-mitigating provisions to apply [retroactively]." (Rodriguez, supra, 183 Cal.App.4th at p. 7.) We do not find Rodriguez persuasive. First, the court in that case found it significant that the amendments to section 4019 lessen punishment "by allowing [qualified prisoners] to accrue conduct credits at a greater rate than other felons, and not, as in Estrada, by reducing the penalty for a specific offense." (Rodriguez, at p. 8.) As noted above, in our view, this is a distinction without a difference. Second, we believe the court unduly emphasized the incentive effect of conduct credit in distinguishing such credit from "statutes which reduce punishment in other ways" (id. at p. 10) because "`it is impossible to influence behavior after it has occurred'" (id. at p. 8). We disagree with both the Attorney General here and the court in Rodriguez on the crucial question of intent. The relevant question is the Legislature's intent in amending the statute, not the purpose for its initial enactment. In any case, as we have addressed elsewhere the authority on which the Rodriguez court primarily reliedStinnetteis clearly inapt. The issue here is not whether a rational basis exists for a prospectivity provision, but whether we should infer a retroactive intent in the absence of such a provision. Third, we do not agree that Estrada applies only if "it ... necessarily follow[s] that the Legislature determined the punishment ... was `too severe.'" (Rodriguez, supra, 183 Cal.App.4th at p. 9.) The issue is whether the Legislature has deemed a lesser punishment sufficient. (Estrada, supra, 63 Cal.2d at p. 745.) The policy reasons for such a finding do not diminish its significance. Finally, the Rodriguez court's analysis is unsound to the extent it looks to the legislative history in determining whether Estrada applies in the first instance. (Rodriguez, supra, 183 Cal.App.4th at p. 9.) The rule in Estrada turns on a statute's penalty-reducing effect, not a construction of other sources of legislative intent.
Similarly in Otubuah, the Fourth District also held that Penal Code section 4019 did not apply retroactively. We find that this decision lacks persuasive force. The Otubuah court rejected the notion that the Estrada rule applied to presentence conduct credits, concluding that conduct credits did not "mitigate punishment." (Otubuah, supra, 184 Cal.App.4th at p. 433.) Otubuah reached this conclusion because the Supreme Court has never expressly cited Hunter or Doganiere nor has the Court ever expressly recognized that conduct credits *390 mitigate punishment.[19] Instead, the Otubuah court reasoned that the Supreme Court has described the custody credit scheme as encouraging cooperation and rewarding good behavior. Thus, the Otubuah court concluded that because custody credits are intended to encourage and reward conduct, they should not be considered mitigation in punishment. (Otubuah, supra, 184 Cal.App.4th at p. 434.) This reasoning is flawed. First, the fact that the Supreme Court has not expressly referenced Hunter and Doganiere is of no consequence. These cases were filed in the late 1970's. Thus, the Supreme Court, like the Legislature, as we noted above, has had ample opportunity to express its disapproval of this case law, if the court (or the Legislature) believed they were wrongly decided. The Supreme Court's failure to do so indicates a tacit approval of them. Second, we disagree with Otubuah because like the Attorney General here, the Otubuah majority confuses the initial purpose of section 4019to encourage good behavior in jailwith the ultimate effect of the lawto reduce time served, which clearly mitigates punishment.
Like the Attorney General in this case and the Rodriguez court, the Otubuah court focuses only on the purpose of section 4019, ignoring the primary purpose of the amendment. The Otubuah court acknowledged that the explicit purpose of the amendment was to address a declared fiscal emergency, but also reasoned that such intent is not indicative of an intent for or against retroactivity. We are not convinced. If the Legislature's aim was to reduce prison populations and conserve financial resources in view of the fiscal emergency, then the Legislature's purpose can only achieve its maximum and most immediate effect through retroactive application.
Accordingly, we follow the majority of California courts, as well as Division's One and Six of this district, in holding that section 4019, as amended, constitutes an amendatory statute mitigating punishment under Estrada. We believe this is the better view, as it adheres most closely to the holding in Estrada and the reasoning on which the court relied in that case.
*391 (10) Having concluded under Estrada that the general presumption of prospectivity has been rebutted, we must give retroactive effect to the amendments to section 4019 unless the Attorney General has shown a clear legislative intent of prospective application. (Estrada, supra, 63 Cal.2d at p. 748; In re Chavez, supra, 114 Cal.App.4th at p. 999; Nasalga, supra, 12 Cal.4th at p. 793 [burden to show "`the Legislature [has] demonstrate[d] its intention [to apply the amendments prospectively] with sufficient clarity that a reviewing court can discern and effectuate it'"], quoting In re Pedro T., supra, 8 Cal.4th at p. 1049.) The Attorney General, however, does not contend a clear intent of prospectivity exists, but instead confines his arguments to whether the presumption of prospectivity applies in the first instance. In the absence of clear affirmative indications that the Legislature intended the amendments to section 4019 to have prospective application only, we apply the Estrada presumption that the amendments are retroactive as to all sentences not yet final on direct appeal at the time the amendments went into effect.[20] (11) The statute, as amended, reflects a legislative policy decision that, in light of the budget crisis, the sentences reduced by additional conduct credit are sufficient for qualified prisoners and that the lesser punishment was intended to apply to "every case to which it constitutionally could apply ...." (Estrada, supra, 63 Cal.2d at p. 745.)
(12) Accordingly, under section 4019, as amended, appellant is deemed to have served four days for every two days in local custody and is therefore entitled to a total of 252 days of conduct credit. (People v. Fry (1993) 19 Cal.App.4th 1334, 1341 [24 Cal.Rptr.2d 43].)[21] The trial court awarded him 126 days of conduct credit under former section 4019, so he is entitled to an additional 126 days of conduct credit, for a total of 505 (505=253 actual days of custody + 252 days of conduct credits) days of presentence credit.

DISPOSITION
The judgment is affirmed as to appellant's convictions and it is reversed as to the calculation of presentence local custody credits only. The judgment is hereby modified to award that appellant earned a total of 505 days of presentence custody credit (consisting of 253 days of actual local credit and 252 days of § 4019 conduct credit), and as modified the judgment is affirmed. *392 Upon issuance of remittitur, the trial court will cause its clerk to prepare an amended abstract of judgment that includes the modified award of presentence credit as provided here, and to forward a certified corrected copy of the amended abstract to the Department of Corrections and Rehabilitation.
Perluss, P. J., and Zelon, J., concurred.
NOTES
[1] Anderson testified that though he was supposed to monitor the finances of XMaps he did not monitor the bank accounts of either company very carefully. He testified that he was so busy managing the personnel and work product of both businesses that he would not regularly review the account statements or reconcile account balances. He admitted that a number of checks for the businesses were returned marked "NSF" for insufficient funds.
[2] Anderson also testified that appellant developed a system where checks for accounts payable would be printed and kept in a file, unsigned until the funds were available at which point Anderson would sign them and a member of the office staff would mail them out.
[3] Towards the end of the business relationship between XMaps and EPS in the summer of 2007, appellant informed Mr. Flores that some of the EPS personnel were working for XPrint. Mr. Flores testified that prior to that time, he was unaware that EPS workers were performing tasks for XPrint. Appellant asked Mr. Flores to segregate and separate the billing for XMaps and XPrint. Mr. Flores did not separate the billing; he testified that to do so would require XPrint to enter a separate staffing agreement with EPS.
[4] XMaps paid one EPS invoice for $158.38 in March 2007. XMaps also paid the weekly invoices for March 27, April 3 and April 10, 2007, with one check which was returned for nonsufficient funds. XMaps did not pay any further invoices from EPS and by mid-July, EPS claimed to have an outstanding balance owing with XMaps of approximately $70,000.
[5] Appellant never delivered the check.
[6] The prosecution presented evidence that the bank account connected to the debit card had been closed in November 2005. When appellant was arrested he had the debit card in his wallet; the card bore an expiration date of March 2007.
[7] At trial, appellant admitted that he had a debit card containing the numbers that appeared on the credit authorization sent to EPS, but appellant denied he signed or faxed the completed authorization form to EPS. He denied all knowledge of the credit transaction.
[8] All statutory references are to the Penal Code unless otherwise indicated.
[9] Counts 1 through 8 and count 10 were dismissed by the prosecution prior to trial. According to appellant the dismissed counts pertained to allegations that appellant was a "conman" who had sold the advertising spaces on the map and that the map had never been produced; appellant states that these "phony" advertising sales allegations were the original focus of the investigation and serve to explain why appellant (who sold the map spaces), rather than Anderson, became the target of the police investigation. According to appellant the prosecutor dismissed these counts when it was discovered that the map had in fact been produced, and thus the prosecutor lacked a basis to pursue these charges against appellant.
[10] The conduct credits were determined using a formula dictated by section 4019 as it then existed, which awarded two days of presentence conduct credits for every four days of actual days served.
[11] Section 475, subdivision (c) provides: "Every person who possesses any completed check, money order, traveler's check, warrant or county order, whether real or fictitious, with the intent to utter or pass or facilitate the utterance or passage of the same, in order to defraud any person, is guilty of forgery."
[12] Section 459 provides: "Every person who enters any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse or other building, tent, vessel, as defined in Section 21 of the Harbors and Navigation Code, floating home, as defined in subdivision (d) of Section 18075.55 of the Health and Safety Code, railroad car, locked or sealed cargo container, whether or not mounted on a vehicle, trailer coach, as defined in Section 635 of the Vehicle Code, any house car, as defined in Section 362 of the Vehicle Code, inhabited camper, as defined in Section 243 of the Vehicle Code, vehicle as defined by the Vehicle Code, when the doors are locked, aircraft as defined by Section 21012 of the Public Utilities Code, or mine or any underground portion thereof, with intent to commit grand or petit larceny or any felony is guilty of burglary. As used in this chapter, `inhabited' means currently being used for dwelling purposes, whether occupied or not. A house, trailer, vessel designed for habitation, or portion of a building is currently being used for dwelling purposes if, at the time of the burglary, it was not occupied solely because a natural or other disaster caused the occupants to leave the premises."
[13] Section 484e provides: "(a) Every person who, with intent to defraud, sells, transfers, or conveys, an access card, without the cardholder's or issuer's consent, is guilty of grand theft.

"(b) Every person, other than the issuer, who within any consecutive 12-month period, acquires access cards issued in the names of four or more persons which he or she has reason to know were taken or retained under circumstances which constitute a violation of subdivision (a), (c), or (d) is guilty of grand theft.
"(c) Every person who, with the intent to defraud, acquires or retains possession of an access card without the cardholder's or issuer's consent, with intent to use, sell, or transfer it to a person other than the cardholder or issuer is guilty of petty theft.
"(d) Every person who acquires or retains possession of access card account information with respect to an access card validly issued to another person, without the cardholder's or issuer's consent, with the intent to use it fraudulently, is guilty of grand theft."
[14] In reaching this conclusion we reject appellant's suggestion that his convictions cannot be sustained because there was no proof that he obtained any "benefit" from the use of the bank's credit card account number. A conviction under section 484e does not require proof that the defendant benefited from the unauthorized use or possession of another's credit card information.
[*] Reporter's Note: Review granted on June 9, 2010, S181808.
[dagger;] Reporter's Note: Review granted on June 9, 2010, S181963.
[15] In 1996, the Supreme Court expressly reaffirmed the Estrada rule. (Nasalga, supra, 12 Cal.4th at p. 792, fn. 7.) In a prior case, In re Pedro T., the court had suggested that the rationale of Estrada had been undermined by further developments in penology in this state. (In re Pedro T, supra, 8 Cal.4th at p. 1045, fn. 1, quoting § 1170, subd. (a)(1) ["`Legislature finds and declares that the purpose of imprisonment for crime is punishment'"].) In Nasalga, however, the court rejected an invitation to reconsider Estrada in light of this change in penological theory. "In the 31 years since this court decided Estrada, ... the Legislature has taken no action, as it easily could have done, to abrogate Estrada." (Nasalga, at p. 792, fn. 7.) In short, in Nasalga the court reaffirmed the Estrada rule on the ground of legislative acquiescence, regardless of the continuing persuasiveness of the Estrada rationale. (Cf. People v. Meloney (2003) 30 Cal.4th 1145, 1161 [135 Cal.Rptr.2d 602, 70 P.3d 1023] (Meloney) ["[when] `"a statute has been construed by judicial decision, and that construction is not altered by subsequent legislation, it must be presumed that the Legislature is aware of the judicial construction and approves of it."'"].) After Nasalga, it is no longer open to debate whether the fact that the Legislature enacted a statute that mitigates punishment supports an inference that the Legislature intended the statute to apply retroactively. (Nasalga, at p. 792, fn. 7.)
[16] Section 4019, as amended, does not contain an express savings clause. (Rodriguez, supra, 183 Cal.App.4th at p. 6.)
[17] Sandoval followed Hunter. (Sandoval, supra, 70 Cal.App.3d at pp. 87-88.)
[18] The Smith court followed Estrada and Doganiere and held that 1979 amendments to section 4019 applied retroactively. (Smith, supra, 98 Cal.App.3d at p. 799.)
[19] The Otubuah court relied on In re Kapperman (1974) 11 Cal.3d 542 [114 Cal.Rptr. 97, 522 P.2d 657] (Kapperman), which struck down a provision applying a credit statute prospectively (§ 2900.5, subd. (c)) and distinguished cases like Estrada, which "involv[ed] the application to previously convicted offenders of statutes lessening the punishment for a particular offense." (Kapperman, supra, 11 Cal.3d at p. 546, italics omitted.) Kapperman does not hold, however, that Estrada has no application to statutes increasing sentencing credits; the court found Estrada inapposite because section 2900.5, subdivision (c) expressly stated the Legislature's intent. (Kapperman, supra, 11 Cal.3d at p. 546.) To the extent the Kapperman court's emphasis on "punishment" suggests an increase in credit does not lessen punishment, it was not necessary to the court's holding and is therefore dicta. (Id. at p. 546; People v. Nguyen (2000) 22 Cal.4th 872, 879 [95 Cal.Rptr.2d 178, 997 P.2d 493].)
[20] We recognize that there are currently efforts underway in the Legislature to undo the 2009 amendments to section 4019. The Senate has passed its urgency legislation undoing the amendment of section 4019, and the Assembly's version of this legislation is in committee. (Sen. Bill No. 1487 (2009-2010 Reg. Sess.); Assem. Bill No. 1395 (2009-2010 Reg. Sess.).) However, what the Legislature might do in the future has little bearing on the issue that is currently before us, that is, retroactive application of a law currently in effect.
[21] Because we reach this conclusion, we have no need to address the argument that equal protection rights would be violated if the amendments were given only prospective application.